CASE 20.—ACTION BY HENRY J. STREET'S ADMINISTRA-
TRIX AGAINST THE LOUISVILLE & NASHVILLE
RAILROAD COMPANY.—June 17, 1910.

## L. & N. R. R. Co. v, Street's Admx.

Appeal from Hardin Circuit Court.

W. S. CHELF, Circuit Judge.

Judgment for plaintiff, defendant appeals.—Re-
versed.

1. Railroads—Operation Near Highway—Frightening Horses—
   Duty of Travelers.—Where travelers drive on a highway
   parallel with a railroad track, and particularly when they
   see it is being used by trains, they should govern their ac-
   tions with the knowledge and expectation of such move-
   ments and noises made by railroad trains as may be neces-
   sary in their reasonable operation, and which may frighten
   their horses.
2. Railroads—Operation—Lookout for Horses.—Train operatives
   are not required to keep a lookout on an adjacent highway to
   see if a horse driven thereon is, or is likely to be, frightened
   and thereupon to stop the train, but are only required to op-
   erate the train without unusual or unnecessary noise, and in
   case they become actually aware of the fright of a horse,
   to be even more cautious in making noises in operating the
   train.
3. Railroads—Frightening Horses —Negligence.—Where dece-
   dent was killed by his horse becoming frightened by the noise
   of escaping air from the brakes of a nearby railroad train, the
   jury should have been charged that if the conductor opened
   the air valve in an emergency to prevent a collision, and that
   the noise was the usual and necessary noise incident to the
   prudent and careful operation of the train, there was no
   actionable negligence.

CHARLES H. MOORMAN, JAMES J. DONAHUE and BENJA-
MIN D. WARFIELD for appellant.

GREENE, VANWINKLE & SCHOOLFIELD, B. F. PROCTOR, G. H. HERDMAN and J. H. HAZELRIGG for appellee.

OPINION OF THE COURT BY JUDGE O'REAR—Reversing.

Appellee's intestate, Henry J. Street. and W. D. Wooten were driving in a buggy along a road parallel with a railroad track of appellant, in the village of Upton, on the afternoon of June 13, 1907. As they approached the point where the road forks—one road leading over the track of appellant, and the other leading west away from its track—they discovered a train on the crossing. Street, who was driving, stopped his horse at the fork and at a point about 40 feet distant from appellant's nearest track on the road crossing. The head of the horse was turned toward the road leading away from the crossing. As soon as the horse stopped, Wooten stepped from the buggy, and immediately thereafter the horse became frightened and ran away. Street was thrown from the buggy, or he jumped from it, and was fatally injured, dying a few hours later.

Appellee, as administratrix of the estate of Street, filed suit in the Hardin circuit court against appellant for $30,000.00 damages for his death. The negligence is stated in the petition, as follows: "She says that the Louisville & Nashville Railroad Company is a corporation and common carrier created by an act of the Legislature of Kentucky, with power to sue and be sued under said corporate name, and that its chief lines of roads run through the said town of Upton, and that at the time and place aforesaid defendant's agents and servants did, with gross negligence, frighten a horse attached to a buggy in which said decedent was sitting, and did by such

negligence cause said horse to run and throw said
decedent from said buggy with such force as to cause
his injury and death as the direct and natural result
of such gross negligence, whereby his power to earn
money was destroyed and lost to his estate and this
plaintiff, and they were damaged thereby in the sum
of thirty thousand dollars, which sum this plaintiff
should recover of defendant.''

During vacation and before defendant's motion to
make the petition more specific was ruled on, the
plaintiff filed an amended petition, by which she un-
dertook to specify the acts of negligence complained
of.  This  amended  petition alleges: ''This plain-
tiff, in order to make more specific the allegations of
her petition, as defendant asks, says that at the time
that the horse of her husband  and  intestate  was
frightened and ran, as alleged in her original peti-
tion, her said intestate was sitting in his buggy in a
public street, which was also a public road and pass-
way in the town of Upton, and said town lies on both
sides of said track, and was very near the place where
said street and road crossed the track of defendant on
level or grade crossing; that her said intestate was
compelled to cross said track to reach his place of
business, and also to reach the stable and owner of
buggy and horse, and when he got to the place where
his horse was frightened the said track and · track
crossing  were  blocked  by  several  of  defend-
ant's trains which prevented his passing over  the
track; that said town had a population of 300 people,
all of whom were accustomed to use the track at and
near the crossing, as defendant and its agents and ser-
vants well knew at the time, and that defendant and
its agents did illegally permit said crossing to be ob-
structed as aforesaid by its trains for 40 minutes, an

unreasonable and unnecessary time, and detained her said intestate and thereby kept him from crossing said track, and while her said intestate was so detained by said obstruction, defendant and its agents and servants did, with gross negligence, cause and permit a loud and unusual and unnecessary noise to be made by escaping air, gas, and steam near him, and did by such gross negligence raise a cloud of dust from the roadbed, and knew, or by ordinary care could have known, of the presence of her said intestate, and the danger to him of such negligence, and the horse was frightened and her said intestate was killed and his power to earn money was destroyed and lost to his estate as the direct result of such gross negligence, and without fault on his part."

Appellant's motion to strike out so much of the pleading as alluded to the obstruction of the crossing for an unnecessary length of time was overruled. As the pleadings did not then disclose but that the obstruction contributed in some part to the injury to the intestate, the motion was properly overruled. However, on the trial it developed that decedent had but driven up to the point in the road whence his horse began running but a moment before the incident, in fact just long enough for Mr. Wooten to alight from the buggy. Perhaps it was decedent's purpose to have then crossed the railroad track had it been clear, but so far as he was concerned it does not appear to be material how long the train had been standing there, as the length of time it had comsumed in that position contributed nothing to his injury, did not cause his horse to become frightened, and therefore had no place in the evidence. The fact that the train at that time so obstructed the crossing as to prevent dece-

dent's passing over it was a relevant fact. But the evidence that it had been there longer than was necessary, or for an unlawful length of time, if shown, could have only operated to prejudice the defendant's cause in the eyes of the jury. The evidence on that point should have been excluded. There was evidence to the effect that the horse driven by decedent was a wild, unruly animal in the presence of railroad trains. There was also evidence that he was gentle. Whether it was known to the decedent what his tendency was in this respect is not shown. But there was evidence that he gave signs of fright on coming into view of the train.

There were five trains at Upton on this occasion. The one that was charged to have occasioned the injury was No. 32, a local freight train with 25 or more cars. It occupied the north end of the passing track. Immediately behind it, within 50 feet or less, was another train called No. 12. The caboose of No. 32 was then within a few yards of the engine of No. 12. The two trains completely occupied that track, and in addition some part of the switch ahead of No. 32. In order to make room for another train on the main track to pass that switch No. 32 had to change its position. Those in charge of it claim that in attempting that movement it was endeavoring to couple up a cut of three cars at its rear belonging to it, and which had been cut off to open the crossing. In executing the order for coupling the first effort was a failure. Another moved the cars back, so it is claimed, so that the rear of No. 32 would be forced upon the locomotive of No. 12 if not immediately stopped. In order to avert that the conductor of No. 32, who was standing near and directing the coupling, applied the emergency air brake, the effect of which was to force

out all the air in the air cylinders, causing the brakes to be set immediately. It was the expulsion of this air with suddenness that caused the noise and raised the dust as it hit the ground, which it is said frightened the decedent's horse and caused it to run away. Such is the defendant's theory of the facts. On the other hand, the plaintiff's evidence tended to show that the train was not attempting a coupling at all; that unnecessarily the emergency brake was applied, making an unusual and unnecessary noise. This issue of fact was for the decision of the jury under proper instructions.

Railroads and their prudent operation are as necessary as the use of horses and vehicles, and where the use of these two means of travel and carrying occur in immediate proximity, as they do in great numbers of cases, the rule of conduct imposed by law is that course dictated by such considerations as allow the business to go on, but require it to be so done by the more dangerous of the two agencies, as not to unnecessarily endanger or impede the other. And those who are using it, when the highway and railway are parallel, or cross, or are in the same immediate vicinity, each vehicle has the legal right to use its own road—the train upon the railroad, the horse and buggy on the highway. While the operators of trains must know that people have the right to use, and may in fact at that moment be using, the adjacent highway, the latter are also charged with the knowledge of expected conditions on the railroad tracks, which is to say the usual and ordinary conditions, as well as those extraordinary conditions which may arise out of ordinary use, and which are extraordinary in the sense that they do not happen frequently—nevertheless are likely to happen. Therefore it is, where

travelers upon the highway approach a railroad track, and particularly when they see it in use by trains, they should govern their actions with the knowledge cf such movements and noises made by the railroad trains as may be necessary in their operation. It is well known that these noises excite horses, some more than others, and some uncontrollably. The drivers alone have control of their horses, and are generally alone in position to know the temperament of the animals. Those operating trains in villages, as well as cities and towns, know, too, that horses are driven upon the public roads and streets in the vicinity of the trains, and sometimes they become frightened at them and become uncontrollable. But they also know that their drivers are better aware of their habits in this particular and presumably govern themselves accordingly. The result is in practice that train operatives go ahead handling their trains as if the horses were not present, unless the animals by their actions in sight of the trainmen give evidence of fright and danger to the driver. In that event those controlling the train's movements are under the necessity of not doing anything unnecessarily to add to the dangers of the situation of the driver. It is not customary, nor is it reasonable, to require the train operatives to keep a lookout upon the adjacent highway to see if a horse thereon is frightened, or likely to be, and thereupon to stop their train. Nor is it the law that they must do so. No case to which we have been cited so holds. The utmost requirement is the trainman must operate his own vehicle without unusual or unnecessary noise, and, perhaps, if he actually becomes aware of the fright of the horse, to be even more cautious in the making of noises in operating his train. But if he were also required to use

care to discover horses and their state of trepidation out on the highway some rods away from his track, it would so distract his attention from his necessary duties as probably to imperil more lives and property, including his own life, and more than offset any advantage to the public by requiring him to keep such lookout. It is for that reason, and not from indifference toward the driver of the horse, that the law has never exacted such a degree of care from the trainmen. This much has been said that the instructions given to the jury may be tested.

The first instruction told the jury, among other things, that if those in charge of defendant's train knew, or by the exercise of ordinary care could have known, of the presence of deceased and the danger to him of the noises they were making (if such noises were unusual and unnecessary), the verdict should be for the plaintiff. The instructions should have been confined to a knowledge by the trainmen of the presence of the deceased with his frightened horse, in such proximity to the train as that its noises, not excessive or unnecessary, may have put him in peril. But, upon the plaintiff's theory as to the facts, the first instruction was in substantially proper form.

The jury should have been instructed also that the defendant, its agents and servants had the right to make all usual and necessary noises incident to the prudent and careful operation and movement of the trains, and if they believed from the evidence that the noise made by the escaping air, and which frightened Street's horse, was a usual and necessary noise made in the prudent and careful operation of the train, or if they believed that it was necessary, or believed by the conductor or servant applying the emergency brake, in the exercise of a reasonable judgment,

vol. 139—13

in the necessary and prudent operation of the train, that the air brake should then be applied as it was done, for the purpose of preventing a collision, or loss of life or property, then in either of such events the verdict should be for the defendant. They should have been told that usual and necessary noises were such as were usually or necessarily made in the prudent operation of such trains in such emergencies as the one claimed by the defendant to then have existed, if the jury believed that it did then exist. For emergencies do arise even in the prudent operation of railroad trains, that require extraordinary means to be employed. That is why air brakes and particularly emergency air brakes are provided. If when the occasion for their use arises, the operator must stop, and look about to see if there are any scary horses in sight, and if they are, or any that appear to be, refrain from applying the emergency air brake because it necessarily makes a noise not usually heard, it would be almost useless to provide the emergency brakes. Besides, even if the horse was seen, it might or might not have done some danger to itself or driver; the usual experience is they do not. But if the train was not stopped, it appeared more certain that it would do much more property damage by the impending collision, and most likely imperil more lives also. The duty and natural instinct of the trainman would have been, under such circumstances, to have taken the chance of doing the least amount of damage. The conductor's duty was to act somehow. If he failed to do anything, and damage was done as a result, he and his master would be liable. He must act on the appearances, and in the exercise of a reasonable judgment. If he does so, it cannot be negligence, although if he did not act at all it might be.

Therefore it is the law that he act—act as promptly as the emergency seems to require—and act in the manner which a reasonable judgment then and there suggests. When he does that he has "exercised ordinary care," which is the care that an ordinarily prudent man would have exercised under the same or similar circumstances. This instruction gives the legal effect of the act, and apprises the jury of it in language not calculated to mislead them, or leave them in doubt. This decision is not to indicate a conviction on the part of this court that the defendant sustained its defense by its evidence, but to direct the trial court to submit the defendant's side of the case to the jury along with the plaintiff's.

The verdict and judgment in this case were for the plaintiff under instructions, and evidence, which, as discussed above, we believe were prejudicially erroneous. The judgment is therefore reversed, and cause remanded with directions to award the appellant a new trial under the proceedings not inconsistent herewith.