## Kentucky Traction & Terminal Company v. Humphrey.

(Decided February 22, 1916.)

### Appeal from Franklin Circuit Court.

1. Railroads—Operation of Electric Cars—Ordinary Care Required of Motorman.—It is the duty of the motorman in charge of an electric car, being operated within the city limits, or immediately adjacent to and beside a public road or turnpike, to exercise ordinary care to discover the presence of persons on the street or public road in dangerous proximity to the track, or in a perilous situation, from frightening a horse, and after discovering such danger, or after same could have been discovered by the exercise of ordinary care, to then exercise ordinary care to prevent injuring such persons even to the stopping of the car, and if he should fail to perform these duties, the company is liable to the party injured for the damages sustained.

2. Evidence—Expert Testimony.—Expert testimony is regarded by the law as the weakest kind of testimony, and when admitted at all, it should be done under a strict observance of the rules of law permitting its introduction.

3.  Evidence—Expert Testimony.—Hypothetical questions propound-
    ed to an expert witness should not incorporate in them facts as a
    premise for the answer of the witness, which the testimony does
    not tend to establish, nor should they fail to include any facts
    which the testimony does tend to establish.

4.  Railroads—Operation of Electric Car—Ordinary Care—Instruc-
    tions.—It is error for the court to instruct the jury that it is the
    duty of the motorman in charge of the car after discovering the
    perilous situation of the plaintiff, or if same could have been dis-
    covered by the exercise of ordinary care, "to use reasonable ef-
    forts" to prevent the injury, the correct rule being that the
    motorman under the circumstances should have exercised ordi-
    nary care consistent with the safety of the passengers in his
    charge to prevent the injury.

RICHARD C. STOLL, GUY BRIGGS, WALLACE MUIR and WIL-
LIAM H. TOWNSEND for appellant.

SCOTT & HAMILTON for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Reversing.

The appellee, with her husband, was traveling in an
open top buggy on the pike leading from Frankfort, Ky.,
to Midway, in Woodford county, Kentucky, and while
yet in the corporate limits of the city of Frankfort, and
between the arsenal in the city and the city cemetery,
the horse attached to the buggy in which they were
traveling became frightened at the approach of a car
operated by appellant on its electric line of railroad
running between Frankfort and Lexington, Ky. At the
point where the accident occurred and some distance be-
yond it in the direction from which the car was approach-
ing, the track of the railroad runs upon a part of the
highway and over its northern edge, leaving, however,
ample and sufficient space for the public to travel over
and upon the highway. According to the testimony of
appellee and her witnesses, the approach of the car was
discovered by her some one hundred yards ahead of
where she met it, and at this time the horse which she
was driving began to scare and frighten at the approach
of the car, which she and her witnesses claim was run-
ning at that particular place and time at a very rapid
rate of speed. Her testimony shows that the horse be-
came considerably unruly and was rearing up and other-
wise manifesting evident fright, sufficient to warn the
motorman in charge of the approaching car of the pros-
pective danger to the occupants of the buggy. Just be-

fore the car got even with the horse, the latter made a sudden turn throwing the right front wheel against the curbing of the street, causing it to smash and break, whereby the buggy at that end on that side fell to the street. The husband was sitting on that side and the natural decline of the buggy would cause the body of the appellee to be precipitated against that of her husband, but she claims that either the back or side of the buggy seat struck against her back and perhaps side, or rather the fall threw her body against these parts of the buggy, and inflicted perhaps some slight injuries. We say "slight," because the record is perfectly barren of any evidence showing any bruises producing discoloration and there was a total absence of any character of wound by laceration, break or otherwise.

The evidence of appellant, as developed by its witnesses, considerably preponderated to the effect that while those in charge of the car saw the buggy approaching for perhaps the distance claimed by appellee and her witnesses, yet they say that the horse did not begin to take fright or to show any evidence of it until the car was within some 25 or 30 feet of the horse and buggy and that it was running at that time at a rate of speed not exceeding from four to six miles per hour, and that the car was stopped as it got somewhere about even with the horse and buggy; whereupon the conductor jumped off of the rear end of the car and took hold of the bridle bits of the horse, when he soon became calm and the car proceeded down the hill to the station of appellant in the city of Frankfort.

The testimony seems to be unanimous to the effect that about the time that the conductor took hold of the horse, the husband of appellee got out of the buggy, followed by the appellee, and the appellee led the horse back into Frankfort, a distance of some 200 or 300 yards, and the husband pulled the buggy down the hill and carried it to some repair shop, where in about two hours it was repaired and the journey to Midway was then proceeded with. The appellee remained at the house of her sister some four or five days, when she returned to her home in the country near Frankfort, and about four weeks thereafter she sent for Dr. Ginn, a physician in the neighborhood, and he states that he found her suffering from labor pains. About four weeks thereafter, or eight weeks after the accident, the appellee

gave birth to a stillborn child, which the doctor says
appeared to be a fully developed one, but, as he thinks,
had been dead for some days before the miscarriage.

This suit was filed in the Franklin circuit court on
December 5, 1913, seeking to recover damages of the
appellant in the sum of $10,000.00, it being claimed that
the accident was the result of the negligence and care-
lessness of the motorman in charge of the car by failing
to comply with the duties which the law imposes upon
railroads, including electric railroads, as to travelers
upon the highway immediately adjacent to their tracks,
and it is claimed that the miscarriage was produced by
and resulted from the injuries which plaintiff claims to
have received. The answer is a denial of the allegations
of the petition and a plea of contributory negligence,
which plea was controverted, and upon the trial of the
case there was a verdict and judgment in favor of ap-
pellee in the sum of $1,000.00, and to correct the errors
claimed to have been committed by the lower court, this
appeal is prosecuted.

It will be observed that this accident occurred within
the corporate limits of the city of Frankfort and on one
of its principal streets. In such cases it has been de-
termined many times by this court that it is the duty
of those in charge of the car to exercise ordinary care
to discover the proximity of travelers upon the street
to its track and to exercise ordinary care to prevent
injury to such travelers whether by collision or by fright-
ening animals traveling upon the street, causing them
to produce injuries to their drivers or persons riding in
the vehicle being drawn by them. Moreover, it is the
rule that carriers must exercise ordinary care to prevent
injuries by frightening animals upon highways parallel-
ing the railroad track after the fright of such animals
is *well* discovered in rural districts. L. & N. R. R.
Co. v. McCandless, 123 Ky., 121; L. & N. R. R. Co. v.
Street's Admr., 139 Ky., 186; Ky. Traction & Terminal
Co. v. Downing, 152 Ky., 25.

The Downing case, *supra,* was one against this same
appellant while operating its car by the side of the turn-
pike, but not in the corporate limits of any city.

According to the testimony of appellee and her wit-
nesses, her presence near to the track, as well as the
fright of her horse, not only could have been seen by
the exercise of ordinary care by the motorman, but that

same was seen by him and he made no effort to either check the speed of the car or to stop it before the accident happened, showing that if her testimony is to be believed as to the way the accident occurred, she would be entitled to recover from the appellant whatever damages that could be shown to have proximately resulted from her injuries.

In an effort to show that the miscarriage resulted as a consequence of the injuries, or of the fright of appellee, she testified upon the trial as follows:

"Q. What did you do after you got the wheel on the buggy? A. Went on up home and stayed a few days. Q. To your sister's? A. Yes, sir. Q. Three or four days? A. Yes, sir; and then came back home again, and taken my bed. Q. What was your condition? A. I was in a bad condition. I was just like I am now. Q. In a family way? A. Yes, sir. Q. At what period—what month, how long? A. Six months. Q. Did you suffer any after you got back home? A. Yes, sir, off and on all the time. Q. Did you have a doctor? A. Yes, sir— Dr. Ginn. Q. Did he prescribe for you? A. Yes, sir. Q. How did you suffer? A. From labor pains. Q. What part of your body did they affect? A. My back and sides. Q. Did you suffer in any other way—anything else? Did you have any discharges or anything of that kind? A. Yes, sir; off and on all the time until the baby was born. Q. Describe to the jury how frequent—was it frequent or not? A. No. Well, a right smart, too. Q. Heavy or light? A. Heavy during times. Q. What doctor did you have? A. Doctor Ginn. Q. Did he live in the neighborhood? A. Yes, sir. Q. When was the child born? A. The eighth of October. Q. Was it dead or alive? A. Dead—it had done mortified. Q. Describe to the jury whether or not you suffered much or little? A. I suffered a good deal. Q. How about after that? A. I suffered with my back and sides. Q. Have you ever recovered? A. No, sir; my sides still hurts. Q. How soon after the accident was it before you commenced to suffer? A. Right at once. Q. Were you in bed any while you were at your sister's? A. Right around all the time I was up there. Q. After you got hurt? A. Yes, sir—all the time, off and on."

Further along in her testimony she testified that she continued to do her household work with the assistance of some of her children, who were old enough to help

her, there being seven of them, and that she was troubled some at that time and on until the day of the miscarriage with swollen feet and limbs to the extent of sometimes being unable to wear her shoes. She also testified to having had a miscarriage in September, 1911, being 25 months before the one complained of in this suit, and at this first miscarriage the child had been conceived for the normal length of time. It was shown by the physicians who testified in the case that pregnant women are subject to the discharges testified to by appellee in that particular stage of pregnancy and that they are also subject to swollen limbs and feet as testified to by her; that these symptoms are perfectly natural. The physicians, both for appellant and appellee, likewise testify that by far the most general cause producing a miscarriage is due to some depleted physical condition of the mother and particularly to some syphilitic condition or to some disordered condition of the kidneys or liver. They furthermore testify that a blow or sudden jar (technically called trauma) is a very rare cause and that wherever it is a producing cause the miscarriage follows within a few days thereafter and especially so when the fetus is as old as this one was at the time of the accident (being between six and seven months). They further testify that when the miscarriage is produced by a blow or jar that the fetus would necessarily die within at least two weeks, after which time nature would begin its efforts to expel it from the mother, which it would do within a much shorter time than was done in this case. Indeed, no physician witnesses who testified, some of whom were of long experience, had ever met with a case in his practice wherein the fetus had been carried by the mother without being expelled sooner than was this one by the appellee; although some of them testified that they had read in some medical publication where the contrary had been shown in one or two instances only.

With the record in this condition, upon the very vital issue as to whether the miscarriage was produced by the accident, the appellee, through her attorneys, over the objections of counsel for appellant, was permitted to propound to her physician witnesses this question: "Now, doctor, assuming that woman in normal health and five or six months pregnant was riding in a buggy and her horse became frightened at the approach of an-

interurban car; and the horse turned around crushing in the buggy wheels, the right front wheel, and she was on the left hand side of her husband and he was on the right side, and she was mashed backward against the back of the buggy and the seat of the buggy, and within a few days or a week *bloody* discharges began to pass from her and *continued* to pass from her, and within three or four weeks a doctor was called in to see her and there were then symptoms of premature child birth, and within sixty days after the accident the child was born and it was dead, what would you say, *in the absence of any other cause,* was the cause of the death of the child and of the premature birth?'' To which they would reply in substance as follows: ''There is no question in my mind but that I would attribute it to the shock or fright.''

Expert testimony is regarded by the law as the weakest character of testimony. It is a species of hearsay testimony forming an exception to the general rule forbidding the introduction of that character of testimony because of the *necessities of the case,* and the tendencies of the courts are constantly inclining in the direction of narrowing the rule permitting its introduction rather than extending it. The expert witness, as latter day experience has taught, always colors his testimony for the side introducing him, and indeed we learn from the history of the country that in great centers of population there exists experts following the business of bartering their expert or scientific knowledge to the litigant who can pay the highest price, and while there is nothing to show that the testimony of any of the physicians in this case was influenced by any such considerations, yet it is because of the existence of the facts which we have stated that the rule of law permitting its admission has been brought to its present condition.

In substantiation of what we have said on this subject, we read from volume 17 of Cyc., 267, as follows:

''The general uncertainty and persistent disagreement of authority on many lines of professional and scientific inquiry, the fact that this class of evidence deals so largely with the problematical and the conjectural, and that there are other elements of unreliability arising from human frailty, bias, loyalty to one's employer, pride of opinion, self-interest, or the heat engendered by controversy, which more or less uncon-

sciously warp the mind of the witness, even without the more vulgar elements of venality and the absence of any efficient punishment for perjury, have caused courts of the highest eminence to feel that experts are frequently rather the hired advocates of the parties than men of science placing their special experience at the service of the cause of justice. Such courts have naturally characterized. this class of evidence unfavorably and have ruled that such evidence should be received with 'caution,' 'with narrow scrutiny and with much caution,' and never receiving it at all except when absolutely necessary.''

Upon this question, Judge Peckham, speaking for the Court of Appeals of New York, in the case of Roberts v. N. Y. Elevated Railroad Co., 13 L. R. A., 499, says:

"It is none the less conjecture and speculation because the expert is willing to swear to his opinion. He comes on the stand to swear in favor of the party calling him, and it may be said he always justifies by his works the faith that has been placed in him." (See also Smith v. Smith, 5 Ky., 722.)

Other authorities could be cited, but we deem it unnecessary.

With this character of evidence being regarded by the law as we have stated, it is the more important that the circumscribing rules permitting its introduction should be the more strictly enforced. The hypothetical question grouping therein the facts forming the premises upon which the answer of the witnesses must be based must include no facts not shown by some of the testimony to have existed; nor must it omit any relative fact shown by some of the testimony to have existed. This is the universal rule and is stated by Prof. Greenleaf in the 16th Ed. of his work on Evidence, vol. 1, sec. 441k: "It would therefore be necessary for him (the expert), in stating his opinion, not only to specify the data for it, but to specify them hypothetically, i. e., as only assumed by him to exist." And further on in the same section: "Thus, the necessity for stating the data hypothetically arises because the witness has no personal knowledge of them and because it cannot before the jury's retirement be known what data they will find to be facts and therefore what opinions are applicable to the case as found by the jury." And again in section 441l: "The purpose of the hypothetical presentation re-

quires that the data put forward to serve as premises should be particularized with sufficient distinctness." And again: "An answer based upon a portion of the testimony should be treated upon the same principle, and is usually held improper."

In volume 17 of Cyc., *supra,* on page 247, the rule is stated, thus:

"Hypothetical conjecture must be based upon facts as to which there is such evidence that a jury might reasonably find that they are established; but it is not necessary that the facts should be clearly proven, or that the exact language of the witness should be shown, or that immaterial facts should be covered by evidence."

This court in the case of Champ v. Commonwealth, 2nd Met., 27, upon the same subject, says:

"Whatever diversity of opinion there may have been in relation to the admissibility of the opinions of experts upon questions of art or science, it is agreed on all hands that such opinion, to be admissible must always be predicated upon, and relate to the facts established by the proof in the case. Mere professional opinion upon abstract questions of science, having no proper relation to the facts upon which the jury are to pass, evidently tend to lead their minds away from the true and real points of inquiry, and should therefore always be excluded."

In the opinion of Pannell v. Louisville Tobo. Co., 113 Ky., 630, this court says:

"The mere opinions of witnesses without the facts upon which they are based are of little value."

And in the case of Baxter's Admr. v. Knox, 19 Ky. L. R., 1973, this court recognizing the rule being considered, says:

"It is not always necessary to prove to a certainty or with any degree of certainty that certain facts exist before the facts may be embraced in hypothetical questions, but is sufficient that all the facts hypothecated be proven by some witness."

The rule was also before this court in the case of Davis v. Commonwealth, 6 Ky. L. R., 658, and it is stated in the syllabus (the opinion not being printed in full), as we have herein indicated, as follows:

"The rule that requires that hypothetical questions asked of experts shall be based upon proven facts only does not require that the exact language of the witness

be used, nor does it require that the questions shall be based upon facts conclusively established by the testimony; hypothetical questions can be based upon any state of facts that any of the testimony sustains, although there may be conflicting testimony.''

From the authorities which we have cited and many others which could be cited, it will be found that the rule requires the examiner to incorporate into the hypothetical question, not necessarily facts which have been conclusively proven, but that he must incorporate therein facts only which the testimony tends to establish and such as the jury may be authorized under the testimony to find. Nor can his question omit in its incorporation proven facts, or those which the testimony tends to prove which are material and would have a bearing upon the principal facts sought to be established or refuted.

Applying this rule to the instant case, we find there to be incorporated in the hypothetical question the following: ''Assuming that a woman in normal health,'' and, ''within a few days or a week *bloody* discharges began to pass from her,'' and further, ''in the absence of any other cause.'' The proof wholly failed to justify the incorporation of these statements in the question complained of. Indeed, when it was stated therein as propounded, ''in the absence of any other cause,'' the witness could not possibly make any other answer except the one desired, which was, that the miscarriage was produced by the accident and resulted from it. There was no proof in the case that the discharges had been any other than the normal ones for a woman in the then condition of appellee, and no proof that the discharges were of such an alarming character as to be ''bloody.''

Without further elaborating this question, we conclude that the error in admitting the question to be propounded as framed was highly prejudicial. Its effect was to almost force an answer from the witness establishing the appellee's cause of action, and without which the miscarriage could not be connected with the accident. Indeed, the answer so obtained from the witness completely refuted the combined experiences of all the physicians who testified in the case, and at once bridged the chasm separating the reasonable from the almost unreasonable. While it is barely possible that this miscarriage was a part of the fruits of the accident, still

where the fact is in such doubt, the evidence to establish it should be admitted under the acknowledged safeguards of the law.  The court should have sustained the objections to the question as propounded.

Complaint is made of instruction number 1, given by the court, and not without justification.  It submitted to the jury the question as to whether the *servants* of the appellant in charge of the car were negligent in failing to keep a lookout and to stop the car, when this duty should have been imposed by the instruction only on the motorman driving the car.  (Louisville R. Co. v. Gaar, 112 S. W. (Ky.), 1130; C. & O. Ry. Co. v. Lange, Admr., 135 Ky., 76.)  But this court has said in the case of Ky. Traction & Terminal Co. v. Downing, *supra*, that under the facts therein, which are similar to the ones in this case, a reversal would not be had for this error.  The instruction, however, erroneously defined the duty of the motorman in charge of the car after discovering the frightened condition of the horse.  Upon this point it says: "Or by the exercise of ordinary care could have discovered that plaintiff's horse was frightened at the approach of the car and she was in apparent danger and he failed to have his car under reasonable control, or if said servant had then and could by *reasonable effort* have stopped the car, etc."  The error in the instruction upon this point consists in the use of the words "reasonable effort."  It was the duty of the motorman after discovering the apparent danger of appellee, or could have discovered it by the use of ordinary care, to have exercised ordinary care, consistent with the safety of the car and his duties to the passengers, to stop the car or prevent further frightening of the horse.  Upon another trial the court will give in lieu of instruction number 1, as follows: "The court instructs the jury, that it was the duty of the motorman, in charge of the car of the defendant, upon the occasion in question, to keep a lookout for travelers on the street, in close proximity to its cars, and to have said car under such control, that it could be stopped within a reasonable time after the discovery, by ordinary care, of the peril, if any, to travelers upon the streets, by reason of horses becoming frightened at the approach of the car; and the court instructs the jury, that if they believe from the evidence, that while plaintiff, on the occasion in question, was passing along East Main Street in Frank-

fort, Ky., riding in a buggy, to which a horse was attached, and the horse became frightened at the approach of the car in charge of the motorman, and after he discovered, or by the exercise of ordinary care could have discovered, that plaintiff's horse was frightened at the approach of the car, and she was in apparent danger, and he failed to have his car under reasonable control, and he negligently failed to exercise ordinary care, consistent with the safety of the passengers on the car, to stop the car, or to slow same down, and continued to negligently move the car towards the horse and buggy in which plaintiff was riding, thereby causing the horse to said buggy to scare and frighten, or turn said buggy around, thereby causing plaintiff to be frightened, shocked or severely thrown against the buggy and injuring her, the law is for the plaintiff and the jury should so find, but unless the jury should so believe, the law is for the defendant, and the jury should so find.''

For the errors indicated, the judgment is reversed with directions to proceed consistent with this opinion.