## Polley et al. v. Cline's Ex'r et al.

(Decided March 13, 1936)

660

J. J. MOORE and HENRY J. SCOTT for appellants.

STRATTON & STEPHENSON and W. K. STEELE for appellees.

OPINION OF THE COURT BY DRURY, COMMISSIONER— Reversing.

From a judgment rejecting a paper offered by them as the will of Mrs. Mary Ford Cline, and approving the probate of one offered by appellees, Mrs. Alpha Polley et al. prosecute this appeal.

## The Facts.

Appellee Allen D. Cline and Mary Ford were married October 25, 1893. February 10, 1932, Mrs. Cline died.

A paper tendered by Allen D. Cline was, on February 18, 1932, probated and ordered recorded as her will by the Pike county court, and this is it:

"In the Name of God, Amen:

"I, Mary Cline, of the City of Pikeville, County of Pike and State of Kentucky, being of sound mind and memory, do hereby make, declare and publish this my last will and testament.

"First. I desire that my funeral expenses and all just debts be paid by my executor, hereinafter to be named, as soon as convenient after my decease.

"Second. I give, devise and bequeath to my husband, A. D. Cline, my entire estate, of whatsoever property consisting, both real, personal and mixed. My object and intention being that, as we are childless, in the event of my decease before

that of my said husband, I desire him to have, absolutely and unconditionally, my entire estate as aforesaid, whether owned by me individually or in connection with him.

"Third. I nominate and appoint my said husband, A. D. Cline, to be the sole executor of this my last will and testament, without bond.

"In Testimony Whereof, I hereunto set my hand and seal, and publish and declare this to be my last will and testament in the presence of the witnesses named below.

"Given under my hand and seal, this 16" day of February, 1907.

"Mary Cline [Seal]

"Signed, sealed, declared and published by the said Mary Cline as and for her last will and testament in the presence of us, who, at her request and in her presence and in the presence of each other, have subscribed our names as witnesses hereto.

"Witness: Lit Bowles
"Linton Trivette."

On January 19, 1933, Mrs. Alpha Polley et al., produced, and there was probated and recorded by the Pike county court, another will, and this is it:

"Filed Jan. 19, 1933.
"Ernest Wolford Clerk
"by Fern S. Wolford DC

"I Mary F. Cline, of the City of Pikeville, County of Pike and State of Ky.; being of sound mind and memory, do make, publish and declare this to be my last will and testament, to-wit:

"First—All my just debts and funeral expenses shall be first duly paid.

"Second—I give, devise and bequeath to my sisters and brothers namely: Martha Hatfield, Alpha Polley, Mousie Coleman, Josephine Moore, Alonzo Ford and Bert Ford, in complete and perfect ownership all my rights and property of every kind and nature, whether real, personal or mixed, wherever situated.

"This is my last will and testament, hereby revoking all former wills made by me

"In witness whereof I have hereunto set my hand and seal, this ——— day of ——— A. D. 19

"[Signed] Mary Ford x Cline
her
mark

"Witness:
"J. E. Polley
"A. L. Trimble"

On February 1, 1933, Allen D. Cline in his own right and as executor of Mary Cline appealed to the Pike circuit court from the probate of the last-mentioned paper, and on February 19, 1933, Mrs. Alpha Polley et al. appealed to that court from the probate of the paper dated February 16, 1907. In each case the judgment was superseded and supersedeas served.

November 22, 1934, the two appeals were consolidated. November 24, 1934, the jury, having been unable to agree, was discharged.

On March 7, 1935, the second trial was begun, and on March 9, 1935, nine of the jury returned this verdict:

"We the jury agree and find the paper read in evidence bearing date the 16 day of February, 1907, and witnessed by Lit Bowles and Linton Trivette, to be the last will of Mary Cline."

Judgment was entered pursuant to the verdict, and their motion and grounds for a new trial having been overruled, Mrs. Alpha Polley et al. appeal.

### The Issue.

If the undated paper, to which Mrs. Cline's signature purports to have been made by her mark (hereinafter referred to as the last will), is valid, it supersedes the one dated February 16, 1907 (hereinafter referred to as the first will), and thus this last will and the circumstances surrounding it and its execution, etc., are the real issues presented, and as to it the issue narrows down to this single question:

### Was It a Forgery?

Since this question of forgery also appears in the case of Mary Stone v. Elizabeth Stone, ——— Ky. ———,

—— S. W. (2d) ——, this day decided, much that is said in that opinion is applicable here, but will not be here repeated.

It will be observed this last will is not dated, but the failure to date it is rather convincing evidence of its genuineness for a forger is careful to observe every detail; he omits nothing.

Osborn, in his work on Questioned Documents (2d Ed.), notes this characteristic, and on page 163 he says the forger appears to be unable to restrain the impulse to make it "a little more perfect." On page 164 Mr. Osborn says:

"Convincing evidences of genuineness in all kinds of written documents are indications of carelessness and disregard of minor and unimportant details in connection with close adherence to form designs, and the opposite characteristics naturally are always suspicious. Reserve and self-control are rare qualities in the forger and the very act itself, with attention necessarily fixed on the process, leads to excessive perfection of details."

Mr. Osborn adds on page 365 with reference to incompleteness and carelessness:

"All of these qualities in writing are inconsistent with the mental condition accompanying the act of forgery."

Each criminal thinks his will be the perfect crime; the forger knows he is committing a felony, and endeavors to omit no detail that would arouse suspicion and possibly lead to detection; his mind is alert, his brain on fire, and he would not have omitted the date. But let us return to the paper before us.

Its execution appears to have been witnessed by J. E. Polley and A. L. Trimble, and as the latter died suddenly in 1932, we have not the benefit of his testimony, and while J. E. Polley testifies to the due execution and attestation of this last will, it is asserted by Allen D. Cline that Polley's testimony is false and that the signature of A. L. Trimble is a forgery, so we shall at this point insert a summary of what he testified.

Polley's Testimony.

Mr. Polley is a son of the appellant Mrs. Alpha

Polley, and a nephew of the testatrix. In 1931 he lived in Winchester but had formerly lived in Pikeville, and a few days previous to election day, November 3, 1931, he had come to Pikeville in the interest of Mr. Stephenson, a candidate for the Senate, and Mr. Hatcher, a candidate for railroad commissioner.

While there and possibly on Friday, October 30th, or Saturday, October 31st, he and John R. Rasnick visited his aunt Mrs. Cline and she asked him to come back that afternoon when Mr. Cline was not there and bring Mr. A. L. Trimble with him. He did so, and Mrs. Cline gave him a key and told him to unlock a trunk there in her room and to get some papers, to which she pointed and told him one of them was her will. He then stated that on account of the operation for cancer of the breast, which had been performed on Mrs. Cline a short time before, she was not able to write her name, and that he and Mr. Trimble had to hold her up while she made her mark, and that he then signed his own name as witness. Polley testified he wrote his aunt's name and she made her mark; and in signing his own name he was standing with the will resting on a trunk; and that Mr. Trimble was standing when he signed the will and it was resting on a dresser. Polley testified Mrs. Cline signed this paper by making her mark in his presence and in the presence of Mr. Trimble, and that both of them signed in her presence and that of each other, and that all this was done with Mr. Trimble's fountain pen, which had green ink in it at the time. The haste of these men to get this done and get back into the political campaign is evidenced by the fact that in this paper as prepared the date had been left blank and they failed to fill in the date.

### Evidence Supporting Polley.

In this record we find a number of checks signed by A. L. Trimble that have been paid and which bear the perforated cancellation made by the bank on which they were drawn. They bear various dates from March 14, 1931, to November 13, 1931, and all are written with green ink, and five are dated within two weeks of the execution of this last will, and these signatures look to us very much like the signature of A. L. Trimble on this will.

Mrs. Hilda F. Coleman, a half-sister of the testa-

trix, testified she visted testatrix in January, 1932, and the night before she left Mrs. Cline told her to look under the rug near her bed and she would find her will and that she should take it with her and put it with her other papers and keep it. She did so and put the will in her safety deposit box in the bank.

Mrs. Tom Clay, a neighbor, testified Mrs. Cline told her she had made a second will and it was under the rug near her bed.

Miss Emma Rowe testified she had worked for Mr. Cline in the store when he was in business, had lived in his home, and had spent four weeks there and waited on Mrs. Cline until her death, and that Mrs. Cline made this statement in the presence of Mrs. Polley, Mrs. Coleman, and Mrs. Hatfield: "I want my sisters to have what I have. I may get better, but I don't think I will. I am not worrying about what I am leaving behind me."

J. B. Polley, the husband of Mrs. Alpha Polley, testified testatrix said to him:

"'I am going to change my will so my sisters and brothers will get what I have got. I have already got one prepared.' She said that she wanted somebody to come and take her acknowledgment of her will and spoke to me about Andrew Trimble, and says, 'He is a notary public, ain't he?' and I told her, yes and I said, 'Mary, it is not necessary to have a notary public to take the will. You have to have two witnesses to it, the way I understand it,' and she told me, she says, 'you see Andrew and tell him to come up here I want to see him' and it wasn't but a few days until I saw Andrew and told him what she said. She says, 'Allen, where is that will we made,' and Allen says, 'You know where it is as well as I do,' and she says, 'No I don't,' and he said, 'I reckon it is in the bank.' and she says, 'I want you to get that will I am going to change my will so my brothers and sisters will get what I have got.'

"When I come back after measuring the grave yard off and everything, she said: 'Well, I feel better satisfied now,' and said, 'We will have a place where we can all be buried together' and, she says 'I have made my will so my brothers and

sisters will get what I have got and I have got the will in good hands.' "

Lon Ford (called Alonzo in the last will), a half-brother of testatrix, testified that in 1928 or 1929 Mrs. Cline asked him to prepare a will for her. She said she wanted to will everything she had to her brothers and sisters outside of Tom and she wanted to leave him a trust fund. Mrs. Cline arranged such a trust.

He testified he then prepared this last will as she directed and gave it to her, and that the paper before him was the one he prepared.

### Mrs. Cline's Reasons for Changing Her Will.

Mrs. Cline died of cancer, which first appeared in her right breast many years ago but gave her no particular trouble until 1928 or 1929; then it began to give her a great deal of trouble; she underwent an operation on September 8, 1930, and two later ones, the last one being in October, 1931. About the time her health failed, she and Mr. Cline began to have domestic trouble. There is evidence he began to drink, to chase foxes and evil women, and that as a result he contracted a venereal disease. One witness testified she said to him:

"We made a will some time ago said I had confidence in him then and I willed what I had to him and he willed what he had to me but she said he told me at the time what belonged to me would go to my sisters but she says I have found out since that it won't unless he just wants to give it to them and the way he is doing he is running around with women and buying cars and wasting his money running through with everything he has got."

A disinterested witness testified he went to the Cline home, and hearing loud and angry language, because of which he hesitated about going in, but Mr. Cline opened the door and inviting him in said, "We are having hell here this morning." "I couldn't remember all he said. He said a whole lot and she said to him, 'Allen do hush, do hush Allen,' and he said, 'Bob she has accused me of going out with women.' Mr. Cline soon left and after he had gone this witness testified Mrs. Cline told him he was running around with women in cars and things like that and was worry-

ing her a whole lot and she was sick. She said she had lost confidence in him entirely, said he was getting out and running out with a low class of people, lots of them."

Another witness or two testified Mrs. Cline feared he would kill her and that he had threatened to shoot her, and had them look at a pistol he had in the pocket of his car. Mr. Cline denied threatening to shoot his wife, but admitted he did have a venereal disease and that Mrs. Cline did not object to his relations with other women. This is the expression he used:

"At one time she says 'go ahead and have all the women you want,' she said that to me. * * * We never had a bit of trouble in the world about a woman, it was agreeable with my wife for me to step aside if I wanted to, I will just tell it, that is the way it was. * * * We had our little troubles, I done things I ought not to have done and done wrong and God forgave me and she did too and our matters were fixed up two years before she died and we were living happy and never was separated."

Human nature is a part of every record; it is one thing we are in contact with from the cradle to the grave. No one can say he completely understands it, yet we learn much about it, and this we know, that women will not tolerate competition. Hence we feel that Mr. Cline weakened the credibility of his testimony when he testified that his wife consented to his sexual irregularities.

### A. L. Trimble's Signature.

Mr. Shirley Leslie testified that for about eight years he was bookkeeper for the James Hatcher Coal Company, that Mr. A. L. Trimble was the superintendent and as such issued from three to five hundred checks per month, that he was acquainted with the signature of A. L. Trimble, and that the name A. L. Trimble at the foot of this last will was the genuine signature of A. L. Trimble.

Dr. M. D. Flannery testified he worked for this coal company for eleven or twelve years while A. L. Trimble was its superintendent, that he was acquainted with the signature of Trimble, and that the signa-

ture on this last will was the genuine signature of A. L. Trimble.

Mr. Francisco testified he worked for this coal company for three years, that after the canceled checks came from the bank he checked them against the stubs, and had handled fifteen or twenty thousand of A. L. Trimble's signatures, and that the signature to this last will was the genuine signature of A. L. Trimble.

Mr. James Hatcher was introduced. There is no evidence to show his connection with the James Hatcher Coal Company, but from questions containing such expressions as "your books," "your coal company," etc., we assume he was its president. He testified A. L. Trimble was his sister's only child, that she died when A. L. Trimble was three years old, that the boy grew up in his home and had worked for the James Hatcher Coal Company for fifteen years, that he knew his signature, and that the signature of A .L. Trimble to this last will was genuine.

None of these witnesses claimed to be handwriting experts, but all testify positively they knew the signature of A. L. Trimble and that the signature of A. L. Trimble on this last will was genuine.

For the appellee several witnesses testify to the cordial relations and domestic felicity existing between Mr. and Mrs. Cline. That simply means no differences arose between these two in the presence of these witnesses.

### The Skilled Witnesses.

The appellee offered six witnesses purporting to be skilled in handwriting, and five of these were permitted to testify, and of these there was but one who claimed to be acquainted with the signature of A. L. Trimble. This witness was Mr. O. O. Graham, who testified he had worked for the Day and Night Bank of Pikeville from 1921 to 1930 and had then become acquainted with Mr. Trimble's signature. However, this witness did not base his testimony, that the signature of Trimble on this last will was not written by Trimble, upon his acquaintance with Trimble's signature, but upon a comparison of this signature with other signatures of Trimble that are admitted to be genuine.

All five of these skilled witnesses so testified. All five of these witnesses testified to having had more or

less experience in matters of handwriting, but there was but one who testified to having had any extensive experience in such work, and he apparently is now making that work his profession, but the others are not. One is keeping books for a motor company, one is selling insurance, one is president of a bank, and the other is an attorney; so we may say that one has made the study of handwriting his vocation while to the others it is but an avocation, to one it is his work to the others it is a diversion, one makes it his business the others make it a sideline. All of these men testify most interestingly and impressively, and one of them went into great detail and testified most elaborately and interestingly; but, after all, this evidence is but the opinion of these men testifying as skilled witnesses.

In Evans v. Com., 230 Ky. 411, 19 S. W. (2d) 1091, 1096, 66 A. L. R. 360, we said:

"Ordinarily a witness is said to testify as an expert when a state of facts, observed by some one else, is hypothetically submitted to the witness, and he is asked, in view of those facts, to state what his opinion is, whereas a man skilled in a particular business, who makes his own observations, and testifies to what he has observed and his conclusions therefrom, is regarded as a skilled witness. He occupies the same position as any other witness, except that it is recognized that within certain lines he possesses a superior knowledge which enables him to understand, as one without such special knowledge could not, what he has observed."

This is cited in Osborn on Questioned Documents (2d Ed.) p. 796.

Regarding this evidence we will have more to say presently.

### Grounds for Reversal.

There are but two rulings on the evidence that are seriously complained of, and we feel the court erred in each instance.

Every bit of evidence regarding the writing of and execution of this last will is of the utmost importance, and Lon Ford testified he had written it for his Aunt

Mary (Mrs. Cline) and had given it to her. He then offered to introduce a form book containing a form he had followed in its preparation and should have been allowed to do so, for the purpose of adding such support as it may to the testimony of Lon Ford that he had prepared this will for Mrs. Cline.

Mr. Cline was allowed to introduce a will he had written on August 2, 1929, and to testify he had written it at his wife's insistence. We have much doubt of this having hurt appellants, for this was at the time of the trouble between Mr. and Mrs. Cline and was doubtlessly a peace offering, but it was a self-serving matter and had no proper place in this record, and upon the next trial it will be omitted.

### The Verdict and the Evidence.

We have stated the evidence rather fully, for we then had in mind the search for evidence to sustain this verdict, and we have not found it.

Here we have the statements of Mrs. Cline that she was going to change her will, the reasons she gave for making the change, the admission by appellee of basis for those reasons, the fact that a new will is offered, the testimony of one witness that he wrote it for the testatrix, the testimony of another that she signed it by making her mark to it, that he witnessed it at her request, that A. L. Trimble signed it, and he saw him sign it, that testatrix gave the paper to her sister to keep for her, and that this is the paper.

Against this we have the evidence of appellee that this is not the signature of A. L. Trimble, without any evidence he knew the signature of A. L. Trimble or had any special skill in matters of handwriting.

Then we have the evidence of five skilled witnesses who testify from comparison with admittedly genuine signatures of A. L. Trimble that the name A. L. Trimble was not in their opinion written by the same man that wrote the signature to the genuine checks. To put it bluntly, their testimony is simply their guess. True it is that because of their skill their guess is worthy of higher regard than that of the ordinary man, but how much? They compared this signature with signatures of Mr. Trimble in 1929. The evidence is that after 1929 Mr. Trimble got one of his fingers of his right

hand seriously injured and his signature was affected by that. The evidence is that when Mr. Trimble signed this will it was resting on a dresser and he was standing stooped over writing on this dresser. We wonder if the ordinary man ever stopped to notice the difference between his signature written on a check when he is comfortably seated at his desk and his signature when standing at a bank counter; if he has, he has often wondered if the signature he so made would pass. Then, too, let us remember the bank counter is of convenient height, and this was written on a dresser the height of which we do not know, but the witness was stooped over. This will is written on a sheet of mimeograph paper which is purposely made soft so that it will readily receive the ink in the mimeographing process, and this caused the ink of this signature to spread and to make what is called "serrations." One witness gave that as his reason for regarding this as a forgery and said the other writing had not spread; but as we see it, and the paper is before us, wherever the writing pressure was the same the spreading was the same.

Against this evidence we have the evidence of four men, who were immediately associated with Mr. Trimble in business, who testify they know his signature and that this is his signature. We learn to know the signatures of men just as we learn to know their voices or their walk. All are unconscious expressions of their individuality, just as individually characteristic as their faces or their figures; yet we would find it quite difficult to set forth in words an exact description of A's voice, B's walk, or C's handwriting, yet we would immediately recognize A's voice even though it were coming over 1,000 miles of telephone wire or by means of radio waves. We know the walk of our associates and can recognize it in the dark. If our friend plays Santa Claus we know him by his walk in spite of his disguise, and in like manner we learn to know the signatures of those whose signatures we often see, though we are sure no man ever makes two signatures that have no differences that can be detected by the microscope, the micrometer, or even by the eye. A few nights ago a party of young people were listening to the radio and some one turned the dial and they heard a lady singing. "Hold that station, that's Grace Moore," some one called out. It was, and she was singing in Italian.

Just as we learn to know a voice so that we can recognize it even in a foreign tongue, we learn to know a signature and can recognize it even though it be written with a peculiar pen or on an unusual kind of paper.

The whole matter finally narrows down to this: How shall this evidence be evaluated? If this be the genuine signature of A. L. Trimble, that is the end of the controversy; but is it genuine? It appears so to be, and must be so held unless by evidence its apparent genuineness be overcome.

The death of Mr. Trimble prevented these parties from producing the best evidence that he made it, which would have been his testimony that he wrote it, and since his evidence of its authenticity is unobtainable, the next best evidence is to be found in the testimony of Mr. Polley that he saw Mr. Trimble write it. In Wilson's Adm'r v. Keeling, 50 S. W. 539, 20 Ky. Law Rep. 1923, we said: "Hardin stands unimpeached, and, if he is a credible witness, his testimony is of far greater value than the opinion of witnesses that the signature is not genuine." If Mr. Polley's testimony be not overcome, this will must be probated, for it is not otherwise attacked. The next best evidence is the testimony of those witnesses who know Mr. Trimble's writing, and after that comes the testimony of those who give their opinions from comparison. We will discuss these later.

Our present statute, section 4828, is almost verbatim the same as section 1 of an act approved February 24, 1797, of which we said in Hall v. Sims, 2 J. J. Marsh. (25 Ky.) 509:

> "The statute requires the attestation of two witnesses; but it is silent as to the mode of proving the fact, that two witnesses did attest. Hence, according to common law principles, one witness may prove that fact."

Earlier than that, in the case of Lindsay's Heirs v. McCormack et al., 2 A. K. Marsh. (9 Ky) 229, 12 Am. Dec. 387, the will of Joseph Lindsay had been proven by the oath of John Ray, a subscribing witness. In that opinion it was said:

> "It was also proven to the court that John Kennedy, the other subscribing witness to the said will,

was killed at the battle of the Blue Licks. * * * This statute, as to making and attestation of the will, is substantially the same as that of England, except by the latter three witnesses are required, whereas by the former but two are required: And it has been invariably held by the courts of that country, that one witness is sufficient to prove the will.''

A case to same effect is Harper v. Wilson, 2 A. K. Marsh. (9 Ky.) 465.

In Turner v. Turner, 1 Litt. (11 Ky.) 101, we said: ''At the execution of this will in 1811, it appears to be attested by three subscribing witnesses. * * * Only one of the attesting witnesses has been produced before this court, * * * although the statute requires the attestation of two, yet it does not require the production of both at the probate, and that one is competent to prove the acknowledgment * * * and the attestation of both witnesses in his presence. * * * He [the witness] also recognizes their hand writing, and other witnesses have proved satisfactorily that the attestation is in the hand writing of these absent witnesses. * * * We, therefore, conceive that the court below erred in rejecting the will of 1811; and that the decision must be reversed, with costs.''

Thus at that early date we were permitting the proof of signatures by those acquainted with the handwriting of the maker, and the probate of a will upon the proof of due execution by one of the attesting witnesses. To that we have since adhered. Overall v. Overall, Litt. Sel. Cas. (16 Ky.) 501; Griffith's Ex'r v. Griffith, 5 B. Mon. (44 Ky.) 511; Doyle v. Brady, 170 Ky. 316, 185 S. W. 1133; Tackett v. Tackett, 204 Ky. 831, 265 S. W. 336; Holden v. Bennett, 243 Ky. 667, 49 S. W. (2d) 568; Grausz v. Conley, 253 Ky. 340, 69 S. W. (2d) 695; Rowland v. Holt, 253 Ky. 718, 70 S. W. (2d) 5.

In saying the evidence of Polley that he saw Trimble sign and that his evidence thereof is better than the evidence of those who testify from acquaintance with his signature, we are not in conflict with the case of

Castner v. Castner, 196 Ky. 660, 245 S. W. 281, and we are supported by Pioneer Coal Co. v. Polly, 208 Ky. 548, 271 S. W. 592, Spooner v. Best's Ex'r, 8 Ky. Law Rep. 185, Wilson's Adm'r v. Keeling, 50 S. W. 539, 20 Ky. Rep. 1923, and by 10 R. C. L. p. 993, sec. 180.

That any one who knows the signature of another, after he testifies to sufficient opportunities he has had to acquire such knowledge, may be permitted to give his opinion as to the genuineness of a signature under suspicion, is well settled. Richie v. Com., 70 S. W. 629, 24 Ky. Law Rep. 1077; Kentucky & West Virginia Power Co. v. Howes, 246 Ky. 843, 56 S. W. (2d) 539; Pioneer Coal Co. v. Polly, 208 Ky. 548, 271 S. W. 592; Andrews v. Hayden's Adm'r, 88 Ky. 455, 11 S. W. 428, 10 Ky. Law Rep. 1049; Kendall's Ex'r v. Collier, 97 Ky. 446, 30 S. W. 1002, 17 Ky. Law Rep. 337; Turner v. Turner, 1 Litt. (11 Ky.) 101; Rawlins v. Com., 7 Ky. Law Rep. 595, 13 Ky. Ap. 918; 26 C. J. p. 968, sec. 134; Jones on Evidence (2d Ed.) sec. 1275; note in 20 Ann. Cas. 108.

After the testimony of a witness who saw the signature made (Polley in this case), the next best testimony is thought to be that of witnesses who have seen the party whose writing is in controversy write, or have had access to or possession of his writings, so as to impress the character of the writing upon the mind, and are enabled to form an opinion by comparing the impression of the writing on their minds with that which may be submitted for their examination. And here the proofs recognized by the early common law ended. 10 R. C. L. p. 993, sec. 180.

This brings us to the next class of evidence, that of the witnesses who had no previous knowledge of Trimble's handwriting or signature and whose testimony is simply their opinions formed after comparing the signature to this will with the admittedly genuine signatures of Trimble submitted to them.

Concerning this we will say that previous to the Act approved May 17, 1886 (see chapter 1254, Acts 1885-86, now section 1649, Ky. Stats.), such testimony was not admissible in this state, see Hawkins v. Grimes, 13 B. Mon. (52 Ky.) 257, and McAllister v. McAllister, 7 B. Mon. (46 Ky.) 269, except in those extreme cases

pointed out in Woodward v. Spiller, 1 Dana (31 Ky.) 179, 25 Am. Dec. 139, and in Hawkins v. Grimes, 13 B. Mon. (52 Ky.) 257, a very instructive opinion. The ancient status of the law regarding this class of evidence is thoroughly reviewed and such evidence rejected in People v. Spooner, 1 Denio (N. Y.) 343, 43 Am. Dec. 672.

The statute now permits such evidence, but of it we have said in Strode v. Strode, 194 Ky. 665, 240 S. W. 368, 27 A. L. R. 313, that it is of the weakest character and is to be received with great caution.

In Kentucky Traction & Terminal Co. v. Humphrey, 168 Ky. 611, 182 S. W. 854, 857, we quoted with approval this concerning it:

" 'The general uncertainty and persistent disagreement of authority on many lines of professional and scientific inquiry, the fact that this class of evidence deals so largely with the problematical and the conjectural, and that there are other elements of unreliability arising from human frailty, bias, loyalty to one's employer, pride of opinion, self-interest, or the heat engendered by controversy, which more or less unconsciously warp the mind of the witness, even without the more vulgar elements of venality and the absence of any efficient punishment for perjury, have caused courts of the highest eminence to feel that experts are frequently rather the hired advocates of the parties than men of science placing their special experience at the service of the cause of justice. Such courts have naturally characterized this class of evidence unfavorably and have ruled that such evidence should be received with "caution," "with narrow scrutiny and with much caution," and never received at all except when absolutely necessary.' Upon this question Judge Peckham, speaking for the Court of Appeals of New York, in the case of Roberts v. New York Elevated Railroad Co., 128 N. Y. 455, 28 N. E. 486, 13 L. R. A. 499, says: 'It is none the less conjecture and speculation because the expert is willing to swear to his opinion. He comes on the stand to swear in favor of the party calling him, and it may be said he always justifies by his works the faith that has been

placed in him,' See, also, Smith v. Smith, 5 Ky. Op. 722."

As to such evidence and its value there is perhaps no more illustrative opinion than the one delivered in Wright's Ex'r v. Simpson, 232 Ky. 148, 22 S. W. (2d) 583, wherein we were considering the testimony of Mr. Osborn, whose book on Questioned Documents we have frequent occasion to use.

Any one who wants to pursue the inquiry farther is referred to the notes in Adam v. Ristine, 138 Va. 273, 122 S. E. 126, 31 A. L. R. 1431, Strode v. Strode, 194 Ky. 665, 240 S. W. 368, 27 A. L. R. 319, In re O'-Connor's Estate, 105 Neb. 88, 179 N. W. 401, 12 A. L. R. 212, Boyd v. Gasser, 78 Fla. 64, 70, 82 So. 758, 6 A. L. R. 500, and the cases to which those notes are appended.

We are compelled to conclude this verdict is not supported by the evidence and that the court erred in not awarding Mrs. Polley et al. a new trial.

Judgment reversed.