## Kentucky Traction & Terminal Co. v. Downing

(Decided February 4, 1913.)

### Appeal from Scott Circuit Court.

1.  Street Railroads—Duty of Motorman When He Sees a Frightened Horse Near the Track.—When a motorman in charge of a car sees a horse badly frightened, in such close proximity to the track as that a slight movement may bring him, or the vehicle to which

he is hitched, in contact with the car, it is a question for the jury to say whether, in the exercise of ordinary care, he should not stop the car before reaching the horse, when the evidence shows this could have been done.

2.   Damages—When Assessment of Excessive in Personal Injury Case.—The evidence showed that a lady was thrown out of a buggy in a collision with a street-car, and as a result one bone in her arm between the wrist and the elbow was broken; she was confined to her bed on account of the injury three or four days, and her arm was in a plaster cast three or four weeks; she suffered quite a good deal of pain from the injury and the strength of her arm was somewhat impaired. Held: that a verdict for $3,000 was excessive, as there was no direct evidence that the injury was permanent or that the use of the arm was permanently impaired.

BRADLEY & BRADLEY and STOLL & BUSH, for appellant.

FORD & FORD, for appellee.

OPINION OF THE COURT BY JUDGE CARROLL.—Reversing.

In an action to recover damages for personal injuries sustained, as she alleged, by the negligence of the appellant company, the appellee was awarded $3,000. A reversal is asked upon several grounds that will be noticed in the course of the opinion.

The appellee sustained the injuries complained of in a collision between a buggy in which she was riding and one of the cars of the appellant company, and the accident happened in this way. The appellee and her brother were driving toward Lexington in a buggy on the turnpike leading from Georgetown to Lexington. The appellee was also carrying in her arms a small child. The road on which she was traveling at the place where the collision occurred ran parallel with and immediately adjoining the track of the appellant company. The car of the appellant company was on its way from Lexington to Georgetown, and, according to the evidence of appellee and her brother, the horse they were driving became frightened at the approaching car when it was at a distance of about four hundred feet from them.

Appellee testifies in substance that her brother and herself and the baby were in the buggy going up the Lexington pike. That as the car came from behind a bridge, the horse began to shy and went over to one side of the road, and then began to back. That she could not see that the car slacked in speed at all. That when the car got close to them the horse whirled and

the buggy went over, and she and the baby, which she still held in her arms, were both thrown under the buggy. That the horse began to scare as soon as the car crossed the bridge about four hundred feet from the buggy. That the ground was level and there was nothing to obscure the view of the motorman, who could plainly see the horse after he passed over the bridge.

In respect to the injury, she said that her left arm was broken and that she was confined to her bed as a result of the accident about three days and her arm was kept in a plaster cast about four weeks during all of which time she suffered a great deal of pain and inconvenience. That the arm where it was broken caused her a good deal of pain and she had very little strength in it, and there was also a knot on her arm at the place where it was broken.

Her brother testified that he was driving the horse and that as soon as the car passed the bridge the horse began to back. That the car did not lessen its speed, and when it was about opposite the buggy the horse whirled around toward the car and turned the buggy over against the car, throwing all of them out. Asked how far the car was when the horse began to back and was frightened, he said: "He began to back just after the car passed the bridge, four hundred feet away, and there was nothing to prevent the motorman from seeing that the horse was frightened, as the road was straight and level."

He also said that as soon as the car passed the bridge the horse stopped, and, as the car came closer, began to back, and that he began to back before the car got close to them and continued to back, and as the car came closer he made the turn that caused the collision.

The motorman said in substance that when the car crossed the bridge it was running at a speed of twelve miles an hour and that he saw the horse and buggy as soon as he came over the bridge, and that when he first saw the horse he was not frightened at all. Asked how far he was from the car when he first gave indications of being frightened, he said:

Fifty or sixty feet.

Q. What did you do?

A. Began slowing up.

Q. State his condition as to how badly he was frightened.

A. When I noticed him he began prancing around a little and I began slowing the car. Then the horse was brought to a standstill. I went up to him very slowly and as I got the car to the horse's head he made an effort to turn around, which he did.

Q. When did you stop the car?

A. Just as he began to turn.

Q. What was the condition of the buggy top? Where was it after the buggy turned over?

A. About the center of the car.

Q. After you saw the horse was frightened, give your best estimate as to the speed of the car after you applied the brakes?

A. Running about four or five miles an hour.

Q. And you did stop it instantaneously, I believe you said?

A. I did, yes, sir.

On cross-examination he was asked and answered these questions:

Q. You say you saw the horse and buggy immediately when you came out of the bridge?

A. Yes, sir.

Q. At that time you say you were going at what rate?

A. About twelve miles an hour.

Q. Coming at that rate of speed in what distance could you have stopped the car?

A. In fifty feet.

Q. When did you slow down?

A. I slowed down about sixty feet from the horse, when I was going at the rate of about five miles an hour.

Q. You slowed down when you saw that the horse was frightened and you were afraid of an accident?

A. Yes, sir; I was.

Q. If at that time you had used all the means in your power to stop the car, you could have stopped it ten feet before you got to them, could you not?

A. Could if the horse had been doing anything to stop for.

Q. Running at the rate of five miles an hour you can stop within what distance?

A. Stop it instantly or right at a dead stop.

Q. Was there anything in the conduct of the horse to indicate that it was necessary to stop the car?

A. None whatever; the horse was standing still.

Q.   Just state what the horse was doing and whether it was necessary to stop the car.

A.   The horse was just prancing around a little; did not act anyway at all like he was going to do anything at all that the car should be stopped for.

Q.   And you thought it necessary to slow the car down when you were in about sixty feet of them because the horse was prancing around?

A.   Yes, sir.''

E. E. Pierce, a passenger in the car, asked to tell what he knew about the accident, said: ''Well I was sitting near the front, about the third seat back, on the pike side of the car when I saw a horse shying or prancing with his feet, and immediately the car commenced to slow down. When we got right even with the buggy or close to it the horse whirled and the buggy struck the car.''

''Q.   How far do you judge the horse was from the car when you first saw him commence to shy?

A.   As near as I could judge, he was about fifty feet.

Q.   Describe just what he did at that time.

A.   Just was prancing on his four feet; just prancing and coming toward the car.

Other passengers on the car testified substantially the same as Pierce. Dr. Pack, the only physician introduced in the case, was asked and answered these questions:

Q.   Describe to the jury the condition you found her in when you were called.

A.   Well, I found fracture of the large bone of the left arm and some injury to the wrist; I suppose a rupture of one of the ligaments probably. The arm swollen and she complained of a good deal of pain.

Q.   With reference to the elbow; where was the fracture, below or above it?

A.   It was about one-third of the distance between the elbow and the wrist.

Q.   From your knowledge of injuries of that character, does it or not cause patients to suffer pain?

A.   Yes sir; it caused her to suffer a good deal of pain.

Q.   Have you examined the arm recently?

A.   Yes sir.

Q.   What is its condition now?

A. Well the fracture has united but there is an enlargement there.

Q. An enlargement at the point of the fracture?

A. Yes.

Q. What about the wrist?

A. She complains a good deal about pain in the wrist, which I think was the result of the ruptured ligament.

Q. I will ask you to state whether or not that arm, from your knowledge of the condition of it, in your judgment, is as strong as it was before it was injured?

A. No sir; I don't think it is; I am sure it is not.

Q. I will ask you whether, in your judgment, it will ever be as strong as it was before the injury?

A. Don't think so.

Q. I will ask you to state whether or not it is, in your judgment, a permanent injury?

A. I think that enlargement will be there permanently. I thought at one time it would be removed by absorption but it was not.

Q. Then I will ask you whether or not, in your judgment as a physician, that arm is permanently impaired?

A. I think it is, sir.

Q. Except this enlargement caused by this callous being thrown out, there is no deformity in the arm, is there?

A. No sir; I think not.

Q. The bones are united, are they?

A. Yes.

Q. In stating that the arm is permanently impaired you did not mean that she could not use the arm or anything of that kind, do you?

A. No sir; she can use it but I doubt if she can use it as well as if she had not had it fractured.

Q. Simply means that it is not altogether as good an arm as it was before the fracture?

A. Not as good.

To sum up the evidence on the subject of the collision it appears that when the motorman first saw the horse he was some four hundred feet away but as to whether or not the horse was then frightened the evidence is conflicting. There is however little if any disagreement between the witnesses that when the car was about fifty or sixty feet from the horse he showed evi-

dence of serious fright and at this time the car, according to the testimony of the motorman, was running about five miles an hour and could have been stopped instantly or within a few feet. That the car was running very slow when the collision occurred is manifest from the physical fact that the car was stopped before it passed the buggy.

On this evidence it is strongly contended by counsel for the traction company that the court should have directed a verdict in its favor upon the ground that the evidence does not show negligence or want of ordinary care on the part of the motorman.

On the other hand, it is said the failure of the motorman to bring the car to a stop which could have been done before reaching the horse when he discovered that the horse was badly frightened, was evidence of such negligence as authorized a submission of the case to the jury.

A fact of controlling importance, and about which there is little or no dispute in the evidence, is that after the motorman discovered that the horse was badly frightened he could have stopped the car before it reached the point in the road where the horse was. In excuse of his failure to stop before reaching the horse the motorman says that he had his car under control, and the conditions did not require him to stop the car, as he did not anticipate that the horse would suddenly turn and bring the buggy in contact with the car. If, in the exercise of ordinary care, it was the duty of the motorman to have stopped the car when he discovered the fright of the horse in close proximity to the track, and before the car reached the horse, it cannot be said that the evidence of his negligence was not sufficient to take the case to the jury.

Upon this point our conclusion is that when a motorman in charge of a car sees a horse badly frightened in such close proximity to the track as that a slight movement may bring him or the vehicle he is hitched to in contact with the car, it is a question for the jury to say whether, in the exercise of ordinary care, he should not have stopped the car before reaching the horse when it appears, as in this case that this could have been done.

Another complaint is that the verdict is against the weight of the evidence, but as we view the evidence there is really no conflict in it on the pivotal point in the

case, and so it is not worth while to discuss further this assigned error.

The instruction defining the duty of the agents of the company in charge of the car is criticized because it told the jury that if they believed from the evidence "That the defendant's servants, agents or employes then and there in charge of defendant's car and operating same, saw, or in the exercise of ordinary care, could have seen that the plaintiff's horse was frightened" * * * *. The objection urged is that the instruction should have confined this duty to the motorman, whereas it embraced all the employes of the company in charge of the car.

We said in Chesapeake & Ohio Railway Co. v. Lang, 135 Ky., 76, and in Louisville Railway Co. v. Garr, 112 S. W., 1130, that in cases like this the instruction should limit the duty of lookout and care to avoid injury to the motorman, as he is the only person who has control of the movements of the car, but manifestly the instruction given could not have misled the jury upon this point, as there was no effort to connect any person with negligence except the motorman, and the jury could not have looked to any person connected with the car except the motorman as being responsible. Although the instruction is subject to the criticism pointed out in the cases mentioned, it was not in this case either misleading or prejudicial.

Some minor criticism is made of other parts of the instructions but they seem to be without merit.

The question in the case that has given us most trouble is the one relating to the amount of the verdict. One bone in appellee's arm between the wrist and the elbow was broken. She was confined to her bed, on account of the injury, three or four days, and her arm was in a plaster cast for about four weeks. There is an enlargement of the arm—to what extent the evidence does not show—at the point of the fracture, and Dr. Pack testified that in his judgment the arm was not as strong as it was before it was injured and that he did not think it ever would be. Asked to state whether or not it was a permanent injury, he answered: "I think that enlargement will be there permanently." Asked to state if in his opinion the arm was permanently impaired, he answered: "I think it is." Asked as to her use of the arm, he said: "She can use it but I doubt

if she can use it as well as if she had not had it fractured."

Appellee testified that she had little if any strength in her arm and that it gave her quite a good deal of pain, and that she could only hold her baby on the arm for a few minutes at a time. She also said that the arm was affected with rheumatism.

Aside from the pain and suffering, the substance of this evidence is that the use of the arm has been somewhat impaired and that the enlargement will be there permanently.

As we have often observed, it is a difficult and delicate matter to attempt to decide whether or not the damages assessed by the jury in a given case are excessive. This difficulty becomes at once apparent when it is understood that the law does not undertake to lay down any measure of damage for personal injuries. And so the amount that may be reasonably awarded must, in the very necessity of things, be controlled by the facts of each particular case, as there are no two cases precisely, or even substantially identical as respects the age and condition of the injured party, the extent of the injuries, the manner of their infliction and the circumstances surrounding the accident.

Confronted with this condition that arises in every case in which the verdict is assailed as excessive, we have adopted the rule of adjudging each case on the facts it presents, and the further rule of not interfering with the verdict of the jury unless it appears at first blush to be so excessive as to indicate that the jury were influenced by passion or prejudice in making the award. The question whether we should interfere with the verdict of a jury is made further embarrassing and difficult by the fact that the jury is the tribunal selected by law for the purpose of estimating in cases like this the amount of recovery to which the injured party is entitled, and for this reason courts should be and are reluctant to set up their judgment against the judgment of the persons who have been set apart to determine this question of fact. But as the law authorizes the granting of a new trial when the court is satisfied the verdict is excessive, it becomes our duty, when the question is raised, to review the finding of the jury and exercise the discretion we are invested with. But in exercising this authority we always keep in mind that the finding of the jury is presumptively reasonable and not to be interfered with

when there is doubt as to its fairness. Judged by this rule, let us see how the case stands on this point.

The measure of damage to which the appellee was entitled was, as said by the court in the instruction, "such sum as would reasonably and fairly compensate her for the physical pain and suffering, if any, already endured by her, and for such as she may be reasonably certain to to endure in the future as the direct result of the injury, and for the impairment of her power to earn money, if the jury believe from the evidence that her injury is permanent."

But there is no direct evidence that the injury is permanent in the sense that the use of the arm, for the ordinary purposes to which it may be assumed appellee would have need for its use, has been impaired. If appellee was in the habit of performing the household duties that many ladies attend to, it is not shown that she cannot use this arm substantially as well as before it was injured. The fractured bone has completely healed, and the only evidence now existing of the injury is some enlargement of the arm at the point of the fracture and the pain that occasionally attends the use of the arm.

That appellee suffered much mental and physical pain from the time of the injury until the arm healed, is not open to doubt, and that it occasionally caused her pain up to the time of the trial, some nine months after the accident, may also be conceded. But mental and physical pain of the extent and character described in the evidence is not sufficient to justify a verdict for $3,000, in the absence of clear and convincing proof of permanent injury and permanent impairment of the use of the injured member. Many cases may be found, that we have written, allowing larger judgments than this to stand, when there was no permanent injury, but in such cases there was intense and long-continued suffering. Many other cases can be found where verdicts as large as this were sustained, when the injured person sustained a permanent injury, and one that permanently impaired his power to earn money, although there was not long-continued suffering on account of it.

The opinions, however, that we have written upon this subject, to some of which our attention has been called by counsel, and many more that we have examined, throw little light, for the reasons stated, on the subject under consideration. If any general rule can be said to

have been laid down, it is the one making a distinction between cases involving mental pain and suffering, without any decided permanent injury or permanent impairment of power to earn money, and cases in which it was shown beyond dispute that there was permanent impairment of the power to earn money, as well as permanent injury.

It would, however, serve no useful purpose to extend this already lengthy opinion in an effort to measure the recovery by amounts allowed in other cases, as this is one subject upon which, in the multitude of cases written concerning it, there can be found no controlling precedent.

After giving to the record the careful attention that it deserves, we have reached the conclusion that the verdict is excessive, and for this reason judgment must be reversed, and it is so ordered.