## Louisville & Interurban Railroad Company v. Murphy.

(Decided March 8, 1921.)

### Appeal from Oldham Circuit Court.

1. Damages—Action for Personal Injuries—Evidence.—When a verdict in a personal injury action is so large that it cannot be sustained unless the injuries are permanent, there must be positive, clear and satisfactory evidence on this issue.

2. Damages—Excessive Damages—Earning Capacity.—One's earning capacity enters into the question whether such a verdict is excessive, as well as business losses claimed to have been suffered as a result of the injury. But the evidence in this case only shows that the appellee had disposed of his farm and Louisville business, but does not show that it was necessary for him to do so as a result of his injuries, or that he sold either at a loss.

3. Damages—Personal Injuries.—Evidence as to permanency of injuries examined and held not to be clear or satisfactory.

STRAUS, LEE & KRIEGER and WILLIS, TODD & BOND for appellant.

EDWARDS, OGDEN & PEAK, FRED FORCHT, N. C. CURETON and PAUL DOHERTY for appellee.

OPINION OF THE COURT BY TURNER, COMMISSIONER—Reversing.

On the morning of May 3, 1917, the appellee, Murphy, was a passenger on one of appellant's cars going into Louisville. While running at a high rate of speed on a curve near Anchorage the car left the track and appellee received several injuries in the nature of cuts, bruises and minor fractures hereinafter considered.

This is an action by appellee for damages growing out of his injuries on that occasion, and upon a trial the jury returned a verdict for $15,000, upon which judgment was entered, and the company's motion for a new trial having been overruled, it has appealed.

The only ground upon which a reversal is asked is that the verdict was grossly excessive, and a consideration of that question involves an analysis of the whole evidence bearing upon the injuries received and their nature and extent.

In addition to the evidence of the plaintiff himself as to the injuries, there were introduced on this issue for the plaintiff Doctors Mason, Weidner and Pope, and for the defendant Doctors Harris and Abell.

Of these five physicians who testified, Dr. Mason, who lived near the scene of the accident, first reached appellee after his injuries. Dr. Weidner, who had formerly been appellee's family physician, was sent for upon his arrival at the hospital at Louisville an hour or so after the injury, as was Dr. Abell, a distinguished surgeon of that city. Dr. Pope first examined the appellee a little more than a year after the accident and treated him for some time, and Dr. Pope was present when Dr. Harris, a representative of appellant, examined the appellee a few days before the trial, which occurred more than two years after the accident.

Appellee himself testifies that immediately after the accident he was unconscious for a short while; that he recovered consciousness before he was removed from the car and taken across the street to a grocery store; that he was bleeding freely and had many cuts on his body; that Dr. Mason arrived shortly after the accident and dressed his wounds; that he remained there for one-half or three-quarters of an hour, when he was taken in an automobile to the St. Joseph's Infirmary in Louisville; that Dr. Weidner, who had been his family physician, was sent for but did not come immediately, and that Dr. Abell was also sent for; that he had two ribs broken on the left side; that the temporary bandages were removed when he reached the infirmary and his several wounds were rebandaged; that his nose was broken and there were other cuts and bruises on his head, and that there was a cut (not very deep) on his neck; that he remained at the infirmary two or three weeks, he supposes, and was under the care of the doctors all that time; that at the expiration of that time he was taken to his home near Crestwood and that it

was two weeks after he came home before he went out much, although he was out on the porch during that time; that he had never been able to do very much business since the accident; that about thirteen years before the accident in question he had received an injury to his right foot in a street car accident in Louisville, as a result of which it had been necessary to amputate two of his toes on that foot; that in the accident here involved his hip and back were bruised and he still suffered a good deal of pain and was no better at the time of the trial than he was two months after the accident; that he had not slept well since the accident and that he was then deaf in his left ear from the lick on the side of his head received in the accident; that he had been under the care of a doctor most of the time since the accident occurred; that Dr. Abell was the principal man in charge of his case while he was at the infirmary; that he was able to go to his place of business in Louisville in six or seven weeks after the accident; and that in August following he went to New York unaccompanied; that he drove his own automobile almost every day and had no difficulty running it for short trips.

Dr. Mason, who was the first physician to reach the appellee after his injury, testified as follows:

"Q. At that time did you know the plaintiff, T. M. Murphy? A. I knew him, but was not personally acquainted with him; I knew who he was.

Q. I will ask you to state to the jury whether or not on that occasion you saw Mr. Murphy? A. Yes, sir.

Q. What was his condition; describe it fully to the jury? A. He had a cut about three and one-half or four inches on the left side of the face, a cut on the nose and on the left side of the neck; he had another bruise over the hip and on the left side of the back; there were little cuts all over the body from glass.

Q. What did you do for him, Doctor—before that, however, did you ever make an examination to ascertain whether or not there were any fractures? A. Yes, sir.

Q. What did you find as to that? A. I think his nose was fractured, I think; I don't know what the X-Ray afterwards taken showed, but the cut on the side of the face I sewed that up immediately, took about nine or ten stitches at the time; the rest of the injuries I put on first aid and sent him on into the St. Joseph Infirmary in Louisville.

Q. Did you examine his ribs? A. Yes, sir.

Q. What condition were they in? A. Fractured; I don't know whether there was a complete separation or not.

Q. Which side? A. Left side.

Q. Did you examine his hip? A. Yes, sir.

Q. Did you examine the condition of his left hip and left leg? A. There were bruises over the left hip and back and left leg.

Q. Where was he taken, Doctor? A. St. Joseph Infirmary.

Q. Did you or not accompany him to the hospital? A. No, sir; I didn't go in with him, but went in my machine a little while afterwards.

Q. How often did you see him after that? A. I saw him twice after that with Dr. Abell.

Q. St. Joseph Infirmary, was it? A. Yes, sir.

. . . . . .

Q. I would like for you, Doctor, to describe to the jury the suffering Mr. Murphy endured on account of his injury? A. The cut on the face was quite painful, extending in length nearly four inches, and the bruises over the body were quite painful, and there was a good deal of swelling on the left side of the body, on the left hip; he was suffering a great deal of pain when I saw him.

Q. What evidence of any shock did you observe? A. Well, the most pronounced probably was the excitement he was under there; there was a slight dilation of the left pupil when I saw him.

Q. What did that indicate, Doctor? A. Indicated that there was some jar or contusion to the spine.

Q. Doctor, did you prescribe anything, give him anything to relieve him? A. I gave him one-quarter of a grain of morphine and one-hundred and fiftieth of a grain of atropin to relieve the pain.

Q. Doctor, you went down to see him after he was at the hospital and saw him with Dr. Abell? A. Yes; twice.

Q. You have not seen him since to examine him? A. Not professionally.''

Dr. Weidner testified as follows:

''Q. How long have you been acquainted with Mr. Murphy? A. Possibly about ten or fifteen years before this accident.

Q. Did you see him on May the third, 1917, at the St. Joseph Infirmary in Louisville? A. Yes, sir.

Q. I wish you would turn to the jury and tell the jury in what condition you found him? A. I saw him on May

third, 1917, some time in the morning, and we examined Mr. Murphy carefully at the time. I think present at the same occasion was Dr. Abell and Dr. Mason. I don't know whether anybody else was present or not; I think Dr. Henderson was present at one time. Mr. Murphy gave us the history of being or having been hurt in a railroad accident or street car accident, whichever it may be. We examined him. He was suffering of course in general from a shake up, and the objective symptoms were as follows: we found at the time that this man had cuts about the face and lip, bleeding of course, and slightly about the left ear; his back pained him a great deal and was very sore; and was very sore and stiff on pressure and manipulation. We diagnosed, we made a diagnosis of two ribs being broken on the left side, possibly the tenth and eleventh ribs; he had a broken nose; then he had an ugly semicircle or cut on the left side of his temple; this was quite an extensive injury and required attention by the surgeon and by a good many stitches at the time. In addition we noticed a loss of blood in the left ear. This is all I noticed and all my notes show about Mr. Murphy. I saw him afterwards with Dr. Abell until he left the hospital. I saw Mr. Murphy professionally again in December, I think the 20th of December, and really for the purpose of a re-examination; at the time he came to me and wanted to find out whether I could do anything for him; he was then suffering with stiffness and considerable pain in his back, that was the pronounced feature. His gait was hampered by this stiffness. I found him in pretty good shape except this loss of blood.

Q. Doctor, prior to May the third, 1917, state whether or not Mr. Murphy was a robust looking man or otherwise; active man in his business? A. I have always known him to be actively engaged in his business; that's the way I first met him.

Q. You had been his family physician, I believe? A. Yes, sir.

Q. Had you ever treated Mr. Murphy, that you remember of, Doctor. A. Yes.

Q. Do you remember what it was for? A. He had some trouble about his liver, gall, at the time; that's been many years ago; he had gotten a kind of catarrhal jaundice.

Q. He recovered from that? A. Yes.

Q. Assuming, Doctor, that at this time, May, 1919, Mr. Murphy still suffers pain, that he still has this stiffness

in his left hip, so that he is compelled to drag the left leg along and walk with a cane, assuming that that condition exists today, could you state whether or not his injuries were permanent that he received May the third, 1917, in this accident? A. If he is still in that fix, in that condition at the present time, I don't know how long it may last; if the injury received was long ago leaving marks, it will probably leave marks for a longer time.

Q. Along in his age, fifty-two years of age, what would you say about it? A. He is about one hundred and two the way he talks here this morning.

Q. Have you noticed any difference, Doctor, since this accident in his manner? A. More today than any time before; I noticed him being kind of sluggish; what it is due to, I don't know."

Dr. Pope testified as follows:

"Q. Were you called upon at any time to treat the plaintiff in this case, Mr. T. M. Murphy? If so, when, and tell the jury what condition you found him in? A. I first saw him on May the 18th, 1918, and gave him at that time a very careful and what I thought was a very thorough examination.

Q. State to the jury whether or not, Doctor, at that time he came to you for relief? A. Yes, sir; he applied to me for treatment.

Q. What did you find the matter with him? A. Well, at that time I found that he was suffering from a very considerable condition of shock of the nerves—let down; that he was very morbid and worried and fretted about matters; also there were visible evidences of injury; he had told me his condition and how the accident occurred. I found that he had on the left side of the skull, extending from the temple back towards the ear, a crescent-like scar of about three and one-half or four inches; he also had a scar upon his nose and one upon the back of his neck on the left side, all of which were loose, free and moveable scars; he had a broken nose, and there was a spot of tenderness and an enlargement to the last two ribs on the left side, just where they come out from the spine. I found the left leg fairly swollen; it was poorly moveable; he moved with difficulty at the left hip joint, and in my opinion he had probably at that time an inflammation of the nerves that supplied the left leg from the hip joint down to the toes. I found that what we call the sacro-iliac joints or joints between the lower part of the

spine and the great big hip bones, I found they had been wrenched or dislocated; they were fixed, especially the left one; there was a very plain and marked loss of hearing in the left ear to the ordinary physical tests. I make no claim to making any special knowledge of the tests of the ear, but to the ordinary tests of the voice at a distance and whisper there was a very marked loss of hearing. When we tested his blood we found it to be extremely thin; if I remember correctly he had a loss of 40 per cent. of the value of his blood; there was a very marked weakness of the heart muscles, and enlargement of the heart and a probable commencing trouble with one of the valves of the heart. That was what I found when I examined Mr. Murphy.

Q. Doctor, assuming that on May the third, 1917, Mr. Murphy, while a passenger on an interurban car, the car going at the rate of twenty or twenty-five or thirty miles an hour, jumped the track, and the car, the body of the car, struck a tree and overturned, and Mr. Murphy was pinned down by the debris from the wreck, would you say that the injuries which you found him to be suffering from on May the 18th, 1918, could or not have been reasonably attributable to that accident? A. Yes, sir.

Q. Doctor, going back to this injury to the hip, the sacro-iliac as you doctors describe it; how does that affect his walk or his ability to walk freely as a person who hasn't that trouble? A. It would make it difficult for a person to walk.

Q. State whether or not it is painful? A. Yes, sir; it is always painful.

Q. Have you examined Mr. Murphy and treated him since that first visit in May, 1918, for the purpose of try ing to relieve him, Doctor? A. Yes, sir; I saw Mr. Murphy, I don't remember how many times, right after he consulted me in May, 1918, and then I have seen him several times since then, but I don't remember just how many times.

Q. When was the last time you examined him, Doctor? A. Day before yesterday.

Q. In company with whom? A. Dr. Harris.

Q. Dr. Harris representing the street car company? A. Yes, sir.

Q. What did you find his condition to be day before yesterday as compared with the condition you found in May, 1918, Doctor? A. As far as his general nervous

condition is concerned, I don't think there is very much difference, or there was very much difference; I think that the condition of the two ribs was somewhat better, I think they were less tender, less swollen; I think there was some less swelling at the left hip joint, and a very plain decrease in swelling in the left leg, and that neuritis was some better.

Q. What was the condition of his hearing as compared with that in 1918? A. Very much worse.

Q. How would that affect his general nervous condition, Doctor? A. Make it worse.

Q. Will you state whether or not, Dr. Pope, his injuries are permanent? A. I consider them to be permanent.

Q. Do you know of any treatment that medical science can give him to relieve those conditions? A. Having said I thought they were permanent, I do not think there are any treatments that will cure those conditions. His trouble can be ameliorated so that he can be made more comfortable, but in my opinion Mr. Murphy is damaged goods and he will remain that way the rest of his life.''

Dr. Harris testified as follows:

''Q. Doctor, at the instance of the Louisville and Interurban Railroad Company did you make an examination of the plaintiff in this case, Mr. T. M. Murphy? A. I did.

Q. Where did you make that examination? A. I made it in the presence of Dr. Curran Pope, in his place of business.

Q. Where is Dr. Pope's place of business? A. On Chestnut street, in the city of Louisville.

Q. When did you make that examination? A. At two-thirty, on the 23rd of May.

Q. What kind of an examination did you make? A. I made a very thorough examination.

Q. Doctor, what evidence of injury did you find upon your examination, if any? A. Well, I found that Mr. Murphy had a scar over his left temple; I think it showed he had had some injury up above the left ear, over the temple; they had healed up very nicely; there was evidence that he had had an injury there, some little scar.

Q. Go ahead. A. He had a white scar on the side of his neck, about an inch long, running from before backwards, with evidence of a cut, a slight cut—the muscles were not cut, which he said he sustained in the accident that day I was examining him. I found on examining

Mr. Murphy that he had at some time in his former life sustained some injury which necessitated a partial amputation of his foot.   He would not, however, let me look at his foot.

Q. Could you tell from his shoe how much of his foot had been amputated?   A. Not positively; it looked to me like he had had what we call 'Coohart amputation of his toes.'

Q. Go ahead, Doctor.   A. He also had sustained early in his life a fractured knee cap; had a big white scar over his knee cap, with a healing of the bone, but with a deformity of the bone.

Q. That was not caused from his injury, was it?   A. No, sir.   He claimed to have had two ribs, two fractured ribs on the left side, near the spine; he complained of some tenderness when I pressed over that region; his ribs had healed up; there was no crepitation.   He also claims or complains of some tenderness over the sacro-iliac joint or connection between the sacrum and ilium, represented by this part of the back (witness indicating to the jury on his own back), the lower part of the back, there was no severe tenderness; he had no atrophy of the muscles; he had no evidence of a separation of the sacro-iliac joint.

Q. Was there any other evidence of any injury there, Doctor, except that he complained of some tenderness? A. No, sir; the examination was entirely subjective, symptoms were subjective.

Q. By subjective, what do you mean, Doctor?   A. I mean that there was nothing that I could discover that revealed any injury except what he complained of.   He seemed to have some difficulty in hearing on one side.   I was not prepared in my examination to examine the— look at the ear drum; he told me that Dr. Pfingst had examined him for that; and that is as far as I went with that examination.   However, I did try to ascertain what the trouble was in his ears, and looked at the records in Dr. Pfingst's office.

Q. As a matter of history, you did go and look at the records, did you Doctor?   A. Yes, sir; I went to Dr. Pfingst's office and looked at the records.

Q. Did he tell you that he had been to Dr. Pfingst's? A. Yes, sir; he told me that he had been there, and I went there to see the records—I took his temperature.

By Mr. Lee:

Will you gentlemen (referring to counsel for the plaintiff)?

By Mr. Peak:

Yes, sir.

Q. What did the records disclose, Doctor?

Question objected to by Mr. R. F. Peak, of counsel for the plaintiff; objection sustained, to which ruling of the court the defendant by counsel excepted.

Q. Well, go ahead, Doctor. A. Mr. Murphy's temperature was normal when I examined him. I took his blood pressure; his systolic pressure was one hundred and twenty-five (125) millimeters of mercury; that means the power of his heart to squeeze the blood into his vessels; his diastolic pressure was sixty-five (65) millimeters of mercury; the difference between the two makes the remaining pressure in the blood vessels; that was sixty (60).

Q. What does all that indicate, Doctor? A. That means that it is pretty good for a man of his age, for the reason there is not any decided discrepancy between his systolic pressure and diastolic pressure at sixty-five (65) and his pulse pressure at sixty (60).

Q. Go ahead, Doctor. A. I examined his urine, and the urine reveals the fact that he is suffering from a slow form of interstitial nephritis.

Q. What is nephritis? A. It's what we commonly call Bright's disease; it is an inflammation of the kidneys.

Q. What organ does Bright's disease affect? A. Kidney. Special gravity of his urine was one thousand and eight (1008); it ought to be one thousand and twenty (1020); he had albumin present in small amounts, which to the physician is a pronounced and positive sign of degeneration in the kidney. He also has a heart lesion, known as the mitral lesion. This is an old lesion, in my opinion, and due from or rather to the possibly long continued intoxication of his system from his kidney.

Q. Was there any evidence of anything in his system to cause heart trouble, or nephritis, or kidney trouble? To what did you attribute that in your examination? A. Well, as I said before, I attributed his heart lesion to the slow intoxication of his body, and perhaps a long intoxication of his body from poisons within his body; that's the only way it is produced.

Q. Doctor, did Mr. Murphy walk with a limp when you saw him? A. Yes, he did.

Q. What caused that limp? A. Well, the only cause that I could find for his limp was that he had had a partial amputation of his foot; then he had an injury on the knee cap, an old injury, that probably had something to do with it.

Q. Was there any condition there of the hip that would cause him to limp or necessitate him using a walking stick? A. None that I could discover by a physical examination. I stripped him and looked him over. I tested him for mobility of his hip joints; should he have had any fixation of the hip joint he would have had a surgical condition known as lacosis of the spine.

. . . . .

Q. From the history of his case that you had and from your examination, to what would you attribute the Bright's disease or nephritis which he has? A. Nephritis, known as interstitial nephritis, which he has, is generally that condition which arrives in the meridian or afternoon of life, due perhaps to over indulgence in the good things of life.''

Dr. Abell testified as follows:

''Q. Dr. Abell, please state whether or not you are acquainted with Mr. Tom Murphy, the plaintiff in this case? A. Yes.

Q. Plaintiff claims that he was on the car on the third day of May, 1917, when it left the track at Anchorage and turned over and he was injured. State whether or not you treated him for said injuries. A. Yes.

Q. When did you first see him and where? A. I saw him on May 3rd, 1917, at St. Joseph's Infirmary, Louisville, Ky.

Q. What examination did you make, and what injuries did you discover? A. A careful physical examination was made; examination of urine was made, and X-Ray examination was made.

Q. Please describe as near as you can in detail the nature and character and extent of his injuries. A. Mr. Murphy presented multiple injuries to head and face. In left temple the skin and scalp were cut entirely through, the wounds extending three or four inches in length; nose was badly bruised and deformed, presenting cuts which extended through skin and underlying flesh. The lower lip presented a cut just above the skin. The remainder

of the head and face showed many bruises and contusions, into some of which dirt had been thoroughly ground. Both eyes were blackened by the effusion of blood in orbits. He suffered much pain in his back, left side and left hip, confining him to bed for some days. X-Ray examination failed to show any fracture of skull or any fracture about the pelvis or left hip; and as well as I remember two ribs were broken posteriorally on left side.

Q. How long did you treat him for his injuries at the infirmary? A. From May 3rd until May 16th.

Q. What progress or recovery did he make during that treatment? A. His progress was satisfactory, but even at the time he left the hospital he complained of pain in his left side and left hip.

Q. Did you treat him after he left the infirmary and went to his home? If so, how long? A. No.

Q. Please state the character of the recovery that he finally made when you ceased to treat him. A. I considered it satisfactory, particularly as there were no objective signs of injury to hip.

Q. State whether or not he had any injury to his hip, and if so, which hip, the nature and extent of such injury? A. Yes, left hip; which from exclusion of bone injuries by X-Ray, must have been of the nature of a sprain.

Q. State whether or not any of his injuries are permanent, and if so, state which injuries are permanent? A. I do not think so.

Q. Describe and state the nature and character of the injury to his head? A. See answer to question five (beginning 'Mr. Murphy presented multiple injuries to head and face.' . . . )

Q. State whether or not he had any shock or injury to the spinal cord, or to the brain? A. No, he presented no such symptoms at the time.

Q. What was the general condition of Murphy at the last time you examined him for treatment? A. Condition was fairly good, examination being made on May 16, 1917.

Q. What injury, if any, was done to his general nervous system? A. Such injury, if present, was purely a subjective one. Cross-interrogatories and answers.

Q. State whether or not the answers to the direct interrogatories are given by you from memory or from your records? A. These are given from memory assisted by the appended statement of mine of date of November 26, 1917.

Q. State whether or not the statements contained in the attached letter addressed by you to Mr. L. R. Curtis, dated November the 26th, 1917, fairly represent the condition of the plaintiff during the time he was under your care and treatment?    A. 'Yes.

Q. Assuming that Mr. Murphy is still under the care of physicians and that he still suffers pain in his left hip and side, and assuming that he is still required to use a cane in walking, state whether or not in your opinion his injuries are permanent?    A. Granting the assumption to be true, the condition must be a neuritis, which is an unusually obstinate condition to treat.

Q. Do you know how many times Mr. Murphy came to see you after he left the hospital and returned to his home?    A. No.

Q. When was the last time you treated Mr. Murphy and what was his condition at that time?    Did he suffer much pain, or any, on account of his injuries?    State fully.    A. I do not recall treating Mr. Murphy since he left the hospital, although I do recall distinctly that on two occasions he spoke to me about the pain in his side and hip.''

Analyzing this evidence, we find that appellee was at the time of the accident fifty-one years of age, and that he had previous to that time suffered an injury which necessitated the amputation of two toes on his right foot; that in his youth he had suffered an injury to one of his knees, and that the scar therefrom still remained; that many years before he had suffered from liver trouble, and had trouble with his gall, and had had a kind of catarrhal jaundice, from which he had recovered; and it is suggested, but not shown by competent evidence, that prior to this injury he had consulted Dr. Pfingst about his left ear.    It is likewise shown by the evidence of Dr. Harris that he had been for a number of years suffering from a form of nephritis or Bright's disease.

On the other hand, it is shown that as a result of this accident he had a broken nose, two fractured ribs on the left side, numerous cuts on his head and face and several bruises, particularly on his left hip.    We have also evidence that he remained in the hospital only thirteen days; that his progress while there was satisfactory; that he was taken to his home at the end of that time; that in about six weeks he was able to go to his place of business in Louisville, several miles away, and that in three

months he was able to travel to New York alone and there transact important business.

Of the five physicians who testified, three of whom were of his own selection, one the emergency doctor sent for at the time of the accident, and the other selected by appellant, we find only one who was willing to say, or does say, that his injuries resulting from this accident are of a permanent nature. Another (Dr. Abell), who had charge of his case while he was in the hospital, says that in his opinion they were not permanent, and this opinion is concurred in by the doctor selected by appellant to examine him (Dr. Harris). Another (Dr. Weidner), who had been his family physician, apparently declines to commit himself as to whether the injuries were or were not permanent, and the emergency doctor was not specifically asked that question.

Taking the evidence of these five physicians as to the nature of his injuries, and considering in connection therewith the facts disclosed as to his physical ailments and injuries prior thereto, and considering along with these the further admitted facts that a short time after the injury he was able to and did drive his own automobile to and from the city of Louisville, a distance of several miles, and that in three months after the accident he went alone on a long journey to the city of New York and there transacted important business, it can not be said with any degree of assurance that the evidence is either clear or satisfactory that the injuries resulting from this accident were permanent, and especially when the uncontradicted evidence of Dr. Abell shows that the X-Ray taken shortly after the accident failed to show any frac ture of the skull or any fracture about the pelvis or left hip, and it is the latter injury which is particularly claimed to have been permanent. I. C. Ry. Co. v. Houchins, 121 Ky. 526.

It is the rule in this state that when a verdict in a personal injury case is so large that it can not be sustained unless the injuries are permanent, there must be positive and satisfactory evidence of the permanency; the evidence must be clear and convincing as to that condition, and where it is not of that clear, positive and satisfactory nature, the verdict will be set aside as excessive. Carter Coal Co. v. Dozier, 170 Ky. 374; I. C. Ry. Co. v. Houchins, 121 Ky. 526; I. C. Ry. Co. v. Basham, 183 Ky. 439.

The evidence is not such as to carry with it that conviction which is generally incident to positive and satisfactory evidence, and we are constrained to hold that the verdict of $15,000 is excessive.

But it is said for the appellee that the evidence shows he was a very prosperous business man and had an income from his business of from $9,000 to $30,000 a year, and that, as argued, he was compelled not only to give up this large and lucrative business because of his injuries received, but that he was compelled to and did sell his stock farm upon which he lived a few miles from Louisville.

Certainly a man's earning capacity should enter into and be considered in determining whether such a verdict is excessive, as well as whether he was compelled as a result of the accident to dispose of his business at a loss.

The appellee's evidence, however, does not disclose that he was compelled to give up his business in Louisville, or to sell his stock farm, because of this accident, or on account of his injuries received therein. He does state that in his Louisville business he had made from $9,000 to $30,000 a year, and that since the accident he had sold all of his mules, and that the business had dwindled away, and that he had sold his stock farm; but there is nothing in his evidence from which it may be fairly inferred that it was necessary for him to do so as a result of his injuries. It does not disclose that he sold his business or his farm, or either of them at a loss. He only says that he had not been able to attend to much business or do trading since the accident; but it is shown by the evidence that he had never exercised more than a supervisory authority over the Louisville business and his stock farm, and his own evidence discloses that since the accident he has been able to do the same, at least to some extent.

Upon the whole case we feel impelled to hold that, as the evidence as to the permanency of his injuries was unsatisfactory, and he has failed to show that he had any business loss as a result of this accident, the verdict was excessive.

The judgment is reversed, with directions to grant appellant a new trial.