## Cincinnati, New Orleans & Texas Pacific Railway Company v. Ross.

(Decided January 29, 1926.)

### Appeal from Pulaski Circuit Court.

1. Damages—$10,000.00 for Claimed Traumatic Neurasthenia Excessive, in View of Unsatisfactory Evidence of Permanency.—Verdict of $10,000.00 for personal injury, of which there was no visible mark, but from which traumatic neurasthenia was claimed to have resulted, held excessive, in view of lack of positive and satisfactory evidence of permanency of injury.

2. Damages—Question of Permanency of Personal Injury to be Submitted by Approved Instructions.—Where there is question of permanency of personal injury, it should be submitted by instructions similar to those approved by this court, giving the jury opportunity to determine such question.

3. Evidence—Hypothetical Question Not to Include Facts of which no Proof.—Hypothetical question, which includes facts of which there had been no proof, is objectionable.

4. Appeal and Error—Citation in Brief of Other than Kentucky Reports Helpful to Court.—Citation in brief of every publication in which a Kentucky case is reported, permissible under Court of Appeals rule 5, subsection 3, as changed, frequently will be helpful to the court.

WILLIAM WADDLE, EDW. COLSTON, MAURICE L. GALVIN and GALVIN & TRACY for appellant.

W. M. CATRON and J. W. COLYAR for appellee.

OPINION OF THE COURT BY DRURY, COMMISSIONER—Reversing.

Appellant was defendant in the trial court, and it has appealed from a judgment of $10,000.00 recovered against it by the plaintiff. On the night of March 11-12, 1923,

plaintiff, who is sheriff of Pulaski county was a passenger on the defendant's train No. 13, *en route* from Lexington to Somerset, and at a point near Pulaski, this train was stopped on account of some roofing that had blown on to the track.    Train No. 43, which was following No. 13, ran into the rear of it, and the plaintiff claims to have been injured in that collision.    A violent storm was raging at the time, which had cut the electric block signal system. The conductors of both of these trains were advised that these blocks were out, and to go through under control without stopping.    Thus, this collision was the result of the inexcusable negligence of the defendant.    At the time of the collision, Ross was asleep in the day coach, with his head leaning on or against the back of the seat in front of him.    The train was struck with considerable force.    Ross was knocked from his seat and fell on his knees between the seats.    A suit case was knocked out of a rack and fell on a young lady's head, and it cut her head slightly.    These two seem to have been the only ones who sustained any injury.    The impact was not sufficient to break any windows in the coach.    Ross appears to have been unconscious for some time, and to revive him, some of his fellow passengers raised the window and let the wind blow the rain into his face.    A taxi was procured and he was taken to Somerset to the house of Dr. S. G. Cain, but for some reason, this doctor did not testify in this case.    The next morning, with assistance, he walked to the hospital of Dr. A. W. Cain. . He remained there two or three weeks.    He then went home and was at home, as he says, for eight or nine weeks, before he went to his office.    He says he suffered in his chest and in the back of his neck, and still suffers intensely.    He says that he cannot walk, yet the evidence shows he has walked to his office; that he has gone fishing; that he has taken part in two moonshine raids; that he has made trips to Louisville, Cincinnati, Lexington and other places; that he collected taxes as usual; that he took part in the Dawson-Fields political campaign, and accompanied Mr. Dawson from Somerset to Monticello, over very rough roads; that he has ridden horseback and led the parade at the county fair just before the trial; that he waited upon the court as sheriff, and at the June term, before this trial, a drunken man entered the court room and made some disturbance.    Plaintiff and two other men rushed back to where he was, seized him, and dragged him into a back

room. There is other evidence in the record tending to show that the plaintiff is not an entire physical wreck. How much his nervousness is the result of his habits, we cannot say. He admits he has been drinking, but says "Not enough to hurt." He denies having been intoxicated, but admits having been comfortably full four or five times, and that every time he has been away he has got a pint of whiskey and drunk it, and admitted that ater a trip to Louisville and Lexington, upon his return home, he went to the hospital. There is in this record, the evidence of several doctors, none of whom testify that liquor would be beneficial to plaintiff in his condition, and several say it would be very detrimental.

Plaintiff claims to be suffering from traumatic neurasthenia. Upon the trial of this case, an X-ray picture of plaintiff's chest, made by Dr. Tate, a dentist, was exhibited, and it was claimed by Dr. Tate that this picture showed that the plaintiff had sustained a fracture of both of his first ribs at the point where they join the sternum or breastbone; but he admitted on cross-examination that he might be mistaken. He further said that he had taken X-ray pictures of a number of broken ribs, and that he never saw a picture like the film he exhibited to the jury. The doctor admitted that he had never treated anyone for a broken rib, nor had he taken any special training or instruction under anyone, in the taking of such pictures. He admitted that X-ray films are difficult to read, and that he had never taken any special instruction in the reading of them. Surgeons of vast experience, shown to be skilled in radiography and general anatomy, were introduced, and testified that the skiagraph made by Dr. Tate did not show a fracture of any of the ribs of the plaintiff, but, on the contrary, showed an absolutely normal condition of the ribs, for a man of his age. Evidently, the plaintiff is neurasthenic. and his counsel strenuously argues that his is a case of traumatic neurasthenia. No one says that directly, but his doctor says: "He seems to suffer from what doctors term a traumatic neurasthenia." He doesn't say that he has such a condition, but says: "The history of the case indicates it." Neither does he say that he would permanently remain in that condition, but contents himself by saying: "My observation is that most of them do not get permanently well." When the verdict in this case is considered in the light of this evidence, we are compelled to say that it is flagrantly excessive.

In Kentucky T. & T. Co. v. Downing, 152 Ky. 25, 153 S. W. 32, the doctor was asked about the permanency of the plaintiff's injuries, and said: "I think that enlargement will be there permanently." When asked if plaintiff's arm was permanently impaired, he answered: "I think it is." This court held there was no direct evidence of permanent injuries. In the case of I. C. R. R. Co. v. Basham, 183 Ky. 439, 209 S. W. 362, the doctor said of the plaintiff's injuries, they were "bound to be permanent." Other doctors did not express an opinion as to whether the injuries were permanent or not, and this court said that that could hardly be accepted as evidence of permanency. In L. & I. R. Co. v. Murphy, 190 Ky. 795, 228 S. W. 442, Dr. Weidner did not make a definite statement about the permanency of the injuries. Dr. Pope said: "Murphy is damaged goods, and he will remain that way the rest of his life." Dr. Harris says nothing about the permanency of the injuries. Dr. Abell, when asked if Murphy's injuries were permanent, said: "I do not think so." In that case this court held the evidence of the permanency of the injuries was unsatisfactory. In the case of Carter Coal Company v. Dozier, 170 Ky. 374, 186 S. W. 140, the evidence shows the plaintiff sustained serious injuries; that several pieces of his skull bone were removed, yet this court held that there was no evidence that those injuries would be permanent. In the case of Union Light, Heat & Power Co. v. O'Connell, 198 Ky. 122, 248 S. W. 237, the doctor, in testifying about the injuries to the plaintiff's hip, said he could not say as to whether it would be permanent or not. The court held the plaintiff was not entitled, under the proof, to a recovery for permanent impairment of her power to earn money. We have cited these cases to show how direct and positive must be the evidence of permanency of injury in order to justify a verdict therefor. The plaintiff, if injured at all, was injured without any visible marks of those injuries, appearing upon him. His skin was broken at no place. There was no mark of a blow upon his head, or any other part of his body. No swelling, no discoloration, and nothing else visible indicated that he had been injured, except that the doctor who examined him in the hospital the morning after the accident says: "There was a marked rigidity of the muscles of the neck. They were in a state of contraction." In other words, plaintiff had a stiff neck. His condition the night before was such that his companions opened the window

and allowed the rain to blow in on him for a while, and that alone might have accounted for the stiff neck. We can not find in this evidence anywhere, anything to justify a verdict for $10,000.00. The evidence is by no means clear that Ross received any injury. There was sharp conflict about that, and but little evidence of the permanency of his injuries, if indeed he sustained any.

"When a verdict for personal injuries is so large that it could be sustained only if the injuries are permanent, there must be positive and satisfactory evidence of permanency."

See Basham, Murphy, Downing and Dozier cases, *supra.* Nature, if given time, is a great healer of all afflictions. In the case of Anshutz v. Louisville R. Co., 152 Ky. 741, 154 S. W. 13, 45 L. R. A. (N. S.) 87, we have a case where the most skilled and reputable physicians and surgeons testified positively and without question, that Mrs. Anshutz had received a permanent injury, and yet, within six months, nature had asserted itself, and all was well again. We see remarkable recoveries every day. We meet our friends and acquaintances sound and well, and recall the fact that just a few months before, the most skilled and reputable surgeons and physicians had said they could never recover. It is because that such recoveries are of every day occurrence, that the courts should require that the evidence of permanent injury be positive and satisfactory before submitting that question to the jury. Dr. Cain said Ross was of a nervous temperament before this accident. Ross testified he had previousy had stomach trouble, and suffered from nervous indigestion. Where there is, as in this case, a question whether the injury is permanent or is something from which the plaintiff may recover, the court should submit the matter to the jury in some form similar to the instructions 2 and 3 prepared by this court in the case of L. & N. R. R. Co. v. Lynch, 137 Ky. 696, 126 S. W. 362, and which will be found in the latter part of that opinion, thus giving to the jury an opportunity to determine for itself whether the injuries are permanent or not.

Over the objection of the defendant to the question, Dr. Seviers was permitted to answer this hypothetical question:

"Prior to that time if Ross had had any shock 16 or 18 months before in which his neck, spine and

shoulders were injured could that have produced the condition you found him in?''

The defendant's objection to this question should have been sustained, as there had been no proof that the plaintiff's spine had been injured or his shoulders injured, or of any injury to his neck, further than that it was stiff. This court has outlined in the cases of Ky. T. & T. Co. v. Humphrey, 168 Ky. 611, 182 S. W. 854, and Axton v. Vance, 207 Ky. 580, 269 S. W. 534, those things that should be contained in these hypothetical questions, and those things that should be omitted, and this hypothetical question is objectionable because it is not in harmony with the principles announced in those cases.

Attention is called to the change in subsection 3 of rule V of this court. Frequently it will be very helpful to this court to have every publication cited in which a case is reported.

The judgment is reversed, and the defendant is awarded a new trial.